22 F.3d 403
 146 L.R.R.M. (BNA) 2095, 62 USLW 2629,
25 Bankr.Ct.Dec. 773,
Bankr. L. Rep. P 75,799
 In re IONOSPHERE CLUBS, INC.; Eastern Air Lines, Inc.; Bar
Harbor Airways, Inc., doing business as Eastern
Express, Debtors.
AIR LINE PILOTS ASSOCIATION, INTERNATIONAL; International
Association of Machinists and Aerospace Workers;
Transport Workers Union of America, Appellants,
v.
Martin R. SHUGRUE, Jr., Trustee for the Estate of Eastern
Air Lines, Inc., Appellee.
 No. 597 Docket 93-5054.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1993.
Decided April 4, 1994.
 
 Richard M. Selzer, New York City (Richard A. Brook, Cohen, Weiss and Simon, of counsel), for appellant Air Line Pilots Ass'n, Intern.
 Joseph Guerrieri, Jr. and Robert S. Clayman, Washington, DC (Guerrieri, Edmond & James, P.C., of counsel), for appellant Intern. Ass'n of Machinists and Aerospace Workers.
 Joseph L. Manson, III, Washington, DC (Douglas W. Hall, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, of counsel), for appellee.
 Before: MINER and WALKER, Circuit Judges, and MUNSON,* District Judge.
 MINER, Circuit Judge:
 
 
 1
 On this appeal we once again concern ourselves with the bankruptcy of Eastern Air Lines. See In re Ionosphere Clubs, Inc., 922 F.2d 984, 988 (2d Cir.1990) ("Ionosphere I "), cert. denied, --- U.S. ----, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991). The Air Line Pilots Association, International ("ALPA"), the International Association of Machinists and Aerospace Workers ("IAM") and the Transport Workers Union ("TWU")[1] (collectively, the "Unions") appeal from a May 24, 1993 order of the United States District Court for the Southern District of New York (Mukasey, J.); In re Ionosphere Clubs, Inc., 154 B.R. 623 (S.D.N.Y.1993), affirming a September 10, 1991 order of the United States Bankruptcy Court for the Southern District of New York (Lifland, C.J.), classifying pre-petition vacation pay claims asserted by former Eastern employees in part as unsecured claims eligible for third-priority status under section 507(a)(3) of the Bankruptcy Code (the "Code"), 11 U.S.C. Sec. 507(a)(3), and in part as general unsecured claims. The district court also rejected ALPA's contention that the bankruptcy court erred by not requiring Eastern and ALPA to arbitrate a dispute over the interpretation of the vacation pay provisions in the collective bargaining agreement between them, finding that there was no arbitrable dispute regarding these provisions. On appeal, the Unions contend that section 1113(f) of the Code supersedes the priority scheme of section 507, giving the vacation pay claims a superpriority status. ALPA also reasserts its contention that the bankruptcy court should have ordered Eastern to arbitrate with ALPA over the interpretation of the vacation pay provisions in the collective bargaining agreement between them. For the reasons that follow, we affirm.
 
 BACKGROUND
 
 2
 On March 9, 1989, Eastern filed a petition for relief under chapter 11 of the Code, 11 U.S.C. Secs. 1101-1174. Martin R. Shugrue, Jr. was appointed trustee of Eastern's estate in April of 1990 and was charged with operating the airline and managing its properties pursuant to the Code. On January 18, 1991, Eastern ceased operations, and all employees of Eastern were terminated by February 1, 1991.
 
 
 3
 ALPA represents the airline pilots formerly employed by Eastern, IAM represents ground services personnel and other employees formerly employed by Eastern and TWU represents all former Eastern flight attendants. The collective bargaining agreements ("CBAs") at issue on this appeal were entered into between Eastern and the Unions pursuant to the Railway Labor Act, 45 U.S.C. Secs. 151-188. The vacation pay provisions of the CBAs are essentially alike. Union employees "accrued" vacation on a day-to-day basis in one year and "earned" the right to take it on January 1 of the following year. Employees generally are entitled to full payment for earned, unused vacation upon their separation from Eastern. The Eastern-ALPA CBA differs slightly in that pilots who retire or are furloughed are entitled to payment for all accrued vacation, including not only vacation earned on January 1 of the year of separation, the standard vesting date, but also vacation accrued in the year of separation. The estates of pilots who die are to be paid as if those pilots had retired.
 
 
 4
 When Eastern filed its chapter 11 petition, many employees had not taken all of their earned vacation and thus had claims for unused vacation pay earned prior to the petition date. These claims total over sixty million dollars. Eastern does not dispute that all ALPA- and IAM-represented employees are entitled to all vacation pay due under the CBAs at the time of their separation from employment, and the vacation pay provisions of the CBAs have not been rejected by Eastern.
 
 
 5
 On July 26, 1991, Eastern moved the bankruptcy court for an order determining the priority of the pre-petition vacation pay claims. There was a dispute between Eastern and the Unions concerning the portion of the employees' unused pre-petition vacation pay eligible for treatment under section 507(a)(3) of the Code, which gives third-priority status to unsecured claims for wages, salaries or commissions, including vacation pay, "earned by an individual within 90 days before the date of the filing of the petition ...; but only to the extent of $2,000 for each such individual." The Unions asserted that all claims for payment of unused vacation accrued in 1988 were entitled to third-priority status, since the "earn" date fell on January 1, 1989, which was within ninety days of the petition date. The Unions also contended that section 1113(f), which prohibits a trustee from unilaterally terminating or modifying a CBA, superseded the priority scheme of section 507 and required that vacation pay be accorded the equivalent priority of an administrative expense pursuant to section 507(a)(1). Eastern urged the bankruptcy court to adopt the reasoning of In re Northwest Engineering Co., 863 F.2d 1313, 1319 (7th Cir.1988), that for purposes of section 507(a)(3) only claims for vacation pay attributable to work performed in the ninety days immediately prior to filing are entitled to third-priority status, subject to the statutory $2000 cap, regardless of when the "earn" date occurred.
 
 
 6
 In a September 10, 1991 order, the bankruptcy court granted Eastern's motion, holding that only claims for vacation pay attributable to work actually performed during the ninety-day period immediately preceding the petition date were eligible for third-priority status, regardless of the earn date. The bankruptcy court also concluded that the remainder of the pre-petition vacation pay claims would be general unsecured claims. Finally, it rejected the Unions' contention that section 1113 should be construed to supersede the priority scheme established by section 507.
 
 
 7
 The Unions appealed the bankruptcy court's order. In a May 24, 1993 order, the district court affirmed the bankruptcy court's disposition in all respects, phrasing the primary issue as "whether judicial application of the priority scheme of Sec. 507 constitutes a unilateral termination or alteration of the provisions of the collective bargaining agreement by the trustee as contemplated by Sec. 1113, and whether the granting of 'superpriority' status to all unrejected pay claims is an appropriate method of enforcing the protections of Sec. 1113." 154 B.R. at 626-27. The district court also rejected ALPA's contention that the bankruptcy court erred in failing to require Eastern and ALPA to arbitrate a purported dispute over the interpretation of the vacation pay provisions in the Eastern-ALPA CBA regarding pilots who retired, were furloughed or had died, finding that there was no dispute between the parties as to the substance of the CBA provisions.
 
 DISCUSSION
 1. Standard of Review
 
 8
 An order of the district court acting in its appellate capacity in a bankruptcy case is subject to plenary review. Ionosphere I, 922 F.2d at 988. Accordingly, we review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. Id.
 
 2. Sections 507 and 1113
 
 9
 On appeal, the Unions have dropped their contention that all claims for vacation pay accrued in 1988 are entitled to third-priority status simply because the pay was earned as of January 1, 1989. They continue to maintain, however, that all vacation pay claims are entitled to a superpriority status equivalent at least to an administrative expense. Thus, we must determine whether, as the Unions assert, section 1113(f) of the Code preempts the application of the priority scheme of section 507. We conclude that it does not.
 
 
 10
 Section 1113 of the Code provides the sole means by which a trustee may assume, reject or modify a CBA. Ionosphere I, 922 F.2d at 989. We have described the purposes of this provision as follows:
 
 
 11
 It ensures that the debtor attempt to negotiate with the union prior to seeking to terminate a collective bargaining agreement. Sec. 1113(b). In the event such negotiations fail, it delineates the standard by which an application by the debtor to terminate the collective bargaining agreement is to be judged by the bankruptcy court and establishes a time frame in which this determination is to be made.
 
 
 12
 Id. Section 1113(f) provides that "[n]o provision of [the Code] shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." The Unions argue that section 1113(f) preempts the priority scheme of section 507 and mandates that the claims for pre-petition vacation pay receive first priority as administrative expenses. Whether section 1113(f) trumps section 507 to create a superpriority for claims arising under CBAs is an issue that has divided the courts within this Circuit and elsewhere. Compare In re Roth Am., Inc., 975 F.2d 949, 954-58 (3d Cir.1992) (holding that vacation pay claims arising under a CBA are subject to the priorities in Sec. 507); In re Armstrong Store Fixtures Corp., 135 B.R. 18, 22 (Bankr.W.D.Pa.1992) ("Sec. 1113(f) does not supersede and render Sec. 507(a) inoperative when determining the priority to be accorded to employee claims"); In re Murray Indus., 110 B.R. 585, 588 (Bankr.M.D.Fla.1990) ("the better view is one which reconciles Sec. 507 with Sec. 1113"), vacated as moot, 140 B.R. 298 (M.D.Fla.1992) with In re Golden Distribs., Ltd., 152 B.R. 35, 37 (S.D.N.Y.1992) (stating "[t]he only way that the intended result of full performance of the [CBA] can be assured, is if claims arising under the [CBA], are treated as administrative expenses"); United Steelworkers of Am. v. Ohio Corrugating Co., No. 4:90CV0810, 1991 WL 213850 at * 1, 1991 U.S.Dist. LEXIS 18815, at * 2-* 4 (N.D.Ohio March 15, 1991) (section 1113 grants "a priority to collectively bargained claims over and above the priorities set forth in Secs. 503 and 507"); In re Arlene's Sportswear, Inc., 140 B.R. 25, 27-28 (Bankr.D.Mass.1992). We find the Third Circuit's holding in Roth--that sections 1113(f) and 507 can be reconciled--to be the better reasoned position and the one most consistent with our analysis of the preemptive scope of section 1113(f) in Ionosphere I.
 
 
 13
 In Ionosphere I, we held that section 1113(f) precluded the application of the automatic stay provisions of section 362 to circumvent Eastern's obligation under a CBA to arbitrate a dispute with ALPA, 922 F.2d at 992, but that it did not preclude the stay of an action brought by ALPA in the Southern District of Florida to enjoin Eastern from "wet-leasing" aircraft to replace Eastern aircraft that were grounded due to striking workers, id. at 994-95. We recognized that section 1113(f) was intended to reverse that portion of the decision in NLRB v. Bildisco & Bildisco, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), in which the Supreme Court held that a CBA was an executory contract which the trustee could unilaterally reject pursuant to section 365(a) of the Code. Accordingly, we held that section 1113(f) "prohibit[ed] the application of any other provision of the Bankruptcy Code when such application would permit a debtor to achieve a unilateral termination or modification of a collective bargaining agreement without meeting the requirements of Sec. 1113." 922 F.2d at 990-91. As applied to a particular section of the Code, however, we cautioned that section 1113(f) was "circumstance specific rather than section specific." Id. at 991. Thus, acknowledging the axiom of statutory interpretation that, " 'when two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective,' " we concluded that we would "give effect to the automatic stay to the extent that its application [was] not in irreconcilable conflict with Sec. 1113." Id. (quoting Radzanower v. Touche Ross & Co., 426 U.S. 148, 155, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976)).
 
 
 14
 We ultimately decided that application of the automatic stay would effectively nullify the arbitration clause in the CBA at issue in Ionosphere I by altering the method of dispute resolution. Accordingly, there was an irreconcilable conflict with section 1113, and the automatic stay could not be applied to stay the arbitration. Id. at 993-94. With regard to the judicial proceeding in the Southern District of Florida, we held that staying the action and allowing the bankruptcy court to hear the dispute did not offend section 1113. Since the bankruptcy court had jurisdiction to hear the matter and adjudication in the bankruptcy court did not alter the method of dispute resolution provided for in the CBA, there was no violation of section 1113(f). Id. at 993.
 
 
 15
 Applying the analytical framework we established in Ionosphere I to the facts of this case, we hold that application of the priority scheme of section 507 will not allow Eastern unilaterally to modify or terminate its obligations under the CBAs. In holding as we do, we are not drawing a mere semantical distinction. Eastern's obligation to satisfy in full the vacation pay claims remains unchanged. Section 507 only establishes the priority of those claims, it does not affect the underlying obligation. As the district court recognized, "Judicial ordering of benefit claims pursuant to Sec. 507 is not equivalent to employer avoidance of obligations under a collective bargaining agreement. The collective bargaining agreement is respected, but the financial obligations issuing from it are accorded priority consistent with the Bankruptcy Code." 154 B.R. at 630. Moreover, application of the priority scheme does not conflict with the purpose of section 1113. As the Third Circuit recognized in Roth,
 
 
 16
 The congressional goal embodied in section 1113 to give special consideration to a collective bargaining agreement and encourage the debtor and the union to reach a mutually acceptable agreement while the provisions of the current agreement remain in effect until the bankruptcy court authorizes unilateral rejection or modification of the agreement pursuant to section 1113 can be satisfied without interfering with the previously established statutory priorities.
 
 
 17
 975 F.2d at 957 (citation omitted). In enacting section 1113, Congress was concerned with preventing employers from using bankruptcy as an offensive weapon to rid themselves of burdensome collective bargaining agreements, not with re-ordering the priority in which claims would be paid. See In re Century Brass Prods., 795 F.2d 265, 272 (2d Cir.), cert. denied, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986).
 
 
 18
 Implying a superpriority for claims arising under CBAs also would disrupt the careful balancing of competing policies embodied in section 507. "Section 507 is intended to be the exclusive list of priorities in bankruptcy. Priorities are to be fixed by Congress. Courts are not free to fashion their own rules of superpriorities or subpriorities within any given priority class." 3 Lawrence P. King, et al., Collier on Bankruptcy p 507.02 (15th ed. 1993); see Nathanson v. NLRB, 344 U.S. 25, 29, 73 S.Ct. 80, 83, 97 L.Ed. 23 (1952) ("The theme of the Bankruptcy Act is equality of distribution; and if one claimant is to be preferred over others, the purpose should be clear from the statute." (internal quotations omitted)). Recognizing this restriction, we are loath to create a class of claims with superpriority status absent express statutory authority. Section 1113 does not address the priority to be accorded claims arising from a debtor's obligations under a CBA. We must therefore assume that Congress intended that the priorities set forth in section 507 should apply to these claims. When Congress has intended to alter the general priority scheme, it has done so explicitly. For example, section 1114(e)(2) expressly confers upon retiree benefits owed by the debtor the status of an allowed administrative expense. See Roth, 975 F.2d at 956. Finally, we note that the Unions' proposed priority scheme is inconsistent with the established rule in this Circuit that vacation pay claims are accorded first-priority status as administrative expenses only to the extent the vacation pay is attributable to post-petition work. See Straus-Duparquet, Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 386 F.2d 649, 650-51 (2d Cir.1967) (construing Sec. 64(a) of former Bankruptcy Act).
 
 
 19
 In support of their position, the Unions place primary reliance on the Sixth Circuit's decision in In re Unimet Corp., 842 F.2d 879 (6th Cir.), cert. denied, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988). The primary issue in that case was whether section 1113 applied to post-petition retiree benefits due under a CBA. Unimet had argued that it could unilaterally eliminate health and life benefits of retirees because retirees were not protected by section 1113. The court rejected this argument and went on to hold that claims for these benefits qualified as administrative expenses, reasoning that "section 1113 unequivocally prohibits the employer from unilaterally modifying any provision of the collective bargaining agreement." Id. at 883-84.
 
 
 20
 The broad language used by the court in Unimet has been construed to require a superpriority for all claims for collectively bargained benefits. See Ohio Corrugating, 1991 WL 213850 at * 4, 5, 1991 U.S.Dist. LEXIS 18815, at * 2-* 4. To the extent that Unimet can be read in this manner, it is inconsistent with our analysis in Ionosphere I and we reject it. We note that the holding in Unimet--that claims for post-petition retiree benefits must be paid as administrative expenses--subsequently was codified in section 1114. See 5 Collier on Bankruptcy, supra, p 1114.02[a]. That Congress was compelled to act suggests that the protection it provided in section 1114 was not already compelled by section 1113.
 
 3. Purported Arbitrable Dispute
 
 21
 ALPA's argument that the bankruptcy court should have required Eastern and ALPA to arbitrate the interpretation of the vacation pay provisions of the CBA between them is confusing, to say the least. ALPA claims that the purported dispute between it and Eastern "concerns the amount, rather than the priority, of vacation pay claims of certain pilots under the Eastern-ALPA [CBA]," specifically, pilots who died, retired or were furloughed. ALPA contends that under the Eastern-ALPA CBA these pilots are entitled to vacation pay earned to the date of separation. Eastern agrees with this--there simply is no dispute. Under the priority scheme imposed by the bankruptcy court, claims for vacation pay attributable to work during the ninety-day period immediately prior to the petition date, March 9, 1989, are unsecured claims entitled to third-priority status, subject to a $2000 cap, pursuant to section 507(a)(3). Claims for vacation pay attributable to work prior to December 9, 1989, are general unsecured claims. Subject to these priorities, pilots who died, retired or were furloughed have claims for vacation pay accrued up to the date of their separation. This is in contrast to pilots who resigned or were terminated after January 1, 1989, who have claims only for vacation pay accrued in 1988.
 
 
 22
 To the extent that ALPA's argument can be construed as a challenge to the priority accorded the vacation-pay claims by the bankruptcy court, determining priorities under section 507 is a matter of statutory interpretation and is not a proper subject for arbitration. See In re Chicago, Milwaukee, St. Paul & Pac. R.R., 852 F.2d 960, 965 (7th Cir.1988) (arbitrator exceeds scope of authority by basing decision on interpretation of legislation). The bankruptcy court, in determining priority for vacation pay claims, followed In re Northwest Engineering Co., 863 F.2d 1313 (7th Cir.1988). In that case, the court was faced with the same type of "accrued/earned" vacation pay clause that is at issue here. The court held that, for purposes of section 507(a)(3), vacation pay was " 'earned' continuously as work is done. The worker receives third-priority treatment for benefits 'earned' in the 90 days before filing--provided always that the employer is indebted to the worker in at least this sum...." Id. at 1319. ALPA does not contend that the bankruptcy court erred in following this precedent.[2] Accordingly, there is no factual dispute as to the amount of the vacation pay claims asserted by ALPA pilots and there is no legal dispute as to the priority of these claims.
 
 CONCLUSION
 
 23
 For the foregoing reasons, the order of the district court is AFFIRMED.
 
 
 
 *
 Honorable Howard G. Munson of the United States District Court for the Northern District of New York, sitting by designation
 
 
 [1]
 The three unions filed a joint notice of appeal, but TWU never filed an appellate brief and did not appear at oral argument
 
 
 [2]
 We note that the analysis of Northwest Engineering is consistent with cases in this Circuit decided under section 64(a) of the former Bankruptcy Act. See Straus-Duparquet, 386 F.2d at 650 (vacation pay is "earned" day to day); In re Schatz Fed. Bearings Co., 5 B.R. 549, 553-54 (Bankr.S.D.N.Y.1980)