**In re KITTY HAWK, INC., et al., Debtors.**

**International Brotherhood of Teamsters, AFL–CIO, Plaintiff,**

**v.**

**Kitty Hawk International, Inc., Defendant.**

**Bankruptcy Nos. 00–42069–BJH, 00–42141 through 00–42149. Adversary No. 00–4092.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Nov. 22, 2000.

---

William R. Wilder, Baptiste & Wilder, P.C., Washington, DC, for Plaintiff.

John David Penn, Haynes and Boone, Ft. Worth, TX, for Defendant.

### *MEMORANDUM OPINION*

BARBARA J. HOUSER, Bankruptcy Judge.

Before the Court is Kitty Hawk International, Inc.'s ("Kitty Hawk" or "Debtor") Motion for Partial Summary Judgment Regarding Priority of Claims (the "Motion"). The Court heard oral argument on the Motion on October 10, 2000. This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law.

### I. *CONTENTIONS OF THE PARTIES*

In its Complaint filed on June 13, 2000, the International Brotherhood of Teamsters (the "Union") contends that the claims of its members (the "Union Employees") arising under a collective bargaining agreement between the Union and the Debtor (the "CBA") are currently due and payable without regard to the provisions of 11 U.S.C. §§ 502, 503, and 507.

The Union further contends that in terminating the Union Employees, the Debtor violated the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101, *et seq.* Specifically, the Union seeks a declaratory judgment that (i) unpaid wages and other benefits to Union Employees under the CBA are currently due and payable because the CBA was not rejected or modified by the Debtor in accordance with 11 U.S.C. § 1113 (and thus remained in full force and effect during the post-petition period) and (ii) amounts owing under the WARN Act (essentially wages for 60 days following the termination of the Union Employees, 59 days of which occurred after the Debtor's bankruptcy filing) are payable as a post-petition expense of administration due to the Debtor's termination of operations without proper notice to the Union Employees.

In the Motion, the Debtor contends that all actions cited by the Union as "wrongful" occurred prior to the Debtor's bankruptcy filing and, as a result, any claims of the Union are pre-petition claims not entitled to priority. Specifically, the Motion seeks a summary judgment declaring that any claims arising under either the CBA (the "CBA Claims") or the WARN Act (the "WARN Claims") are "pre-petition claims governed by 11 U.S.C. §§ 502 and 507 and that they are neither administrative claims under 11 U.S.C. § 503 or some other form of claim requiring immediate payment outside the priority scheme of the Bankruptcy Code." *See* Motion at p. 3.

### II. *FACTUAL AND PROCEDURAL BACKGROUND*

The facts relevant to the Motion are not in dispute. The Debtor and the Union, as collective bargaining agent for the Union Employees, were parties to the CBA which established, *inter alia,* rules, rates of pay, and working conditions. *See* Brief of International Brotherhood of Teamsters in Opposition to Kitty Hawk's Motion for Partial Summary Judgment ("Union

Brief") at pp. 1, 4; Appendix to Plaintiff International Brotherhood of Teamsters Opposition to Defendant's Motion for Partial Summary Judgment ("Union App.") at pp. 1–55. The CBA became effective on October 30, 1992 and was scheduled to expire on October 30, 2003. *See* Union Brief at pp. 1, 4; Union App. at pp. 1–55.

On April 29 and 30, 2000, the Debtor terminated all of the Union Employees. *See* Affidavit of John Turnipseed ("Turnipseed Aff.") at ¶ 3. On April 30, 2000, the Debtor grounded all of its aircraft and ceased all flight operations. *See* Union Brief at p. 4. The Debtor and eight (8) other affiliates filed Chapter 11 on May 1, 2000.[1] No Union Employee was still employed by the Debtor at the time it filed bankruptcy. *See* Turnipseed Aff. at ¶ 5.

On May 2, 2000, the Debtor filed a motion seeking to abandon certain aircraft and engines previously used in its flight operations. *See* Union App. at pp. 56–61. In that motion the Debtor stated that any further operation of these assets was a "drain on resources" and that the assets were "not necessary for an effective reorganization." *See id.*

On June 12, 2000, the Debtor filed a motion to reject the CBA pursuant to 11 U.S.C. § 1113. *See* Union Brief at p. 2. The Union opposed rejection. The Court heard two days of argument and evidence on the Debtor's motion. Before any ruling issued, the Debtor withdrew its motion without objection by the Union. *See id.* at p. 5. By agreement of the Debtor and the Union, the CBA was modified and assigned as part of a sale of certain assets of the Debtor by Order entered on August 11, 2000 (the "Agreed Modification and Assignment Order"). Pursuant to the terms of the Agreed Modification and Assignment Order, the Debtor did not assume the CBA and the modification and assignment of the CBA were to have no effect on the Union's claims in this proceeding. *See* Union Brief at p. 3, n. 2; *see*

*also* Agreed Modification and Assignment Order.

## III. ANALYSIS AND AUTHORITY

### A. Applicable Standards

#### 1. Jurisdiction

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding over which the Court may enter a final judgment. 28 U.S.C. § 157(b).

#### 2. Standard for Summary Judgment

The parties agree that this Court should enter a summary judgment where it appears from the record that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 533 (5th Cir.1996) ("Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *Wilson v. Secretary, Dept. of Veterans Affairs*, 65 F.3d 402, 404 (5th Cir. 1995).

#### 3. Standard for Analysis of Bankruptcy Code Provisions

Construction of the Bankruptcy Code (the "Code") is a holistic endeavor. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In construing the Code, the court must consider the particular statutory language, the design of the Code as a whole, and its object and policy. *Kelly v. Robinson*, 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). Statutes should not be interpreted in a manner that renders certain provisions of the statute superflu-

---

1. An additional affiliated entity, Flight One Logistics, Inc., filed on April 27, 2000.

ous or insignificant. *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 970–71 (5th Cir.1981). One provision of the Code cannot be read or applied in isolation; rather, each provision should be interpreted in light of the remainder of the statutory scheme. *In the Matter of Howard*, 972 F.2d 639, 640 (5th Cir.1992). Provided that the statutory scheme is coherent and consistent, the court generally need not inquire beyond the statute's language. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

## B. *The CBA Claims*

### 1. *Statutory Standards*

#### a. *Collective Bargaining Agreements and Section 1113*

A brief discussion of the history of section 1113 may be of assistance. Section 1113 was enacted by Congress in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In *Bildisco*, the Supreme Court allowed a debtor to reject a collective bargaining agreement as an executory contract under section 365(a). *Id.* at 532, 104 S.Ct. 1188. Specifically, the Court found that a debtor could reject a collective bargaining agreement if it could show "that the collective bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *Id.* at 526, 104 S.Ct. 1188.

█ In response to that decision, and an "immediate and intense" lobbying effort by labor groups, Congress added section 1113 to the Code. *International Brotherhood of Teamsters v. Roth American, Inc. (In re Roth American, Inc.)*, 975 F.2d 949, 955 (3rd Cir.1992) (hereinafter referred to as *Roth American*); *see Air Line Pilots Assoc., Intel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 22 F.3d 403, 406 (2nd Cir. 1994) (hereinafter referred to as *Ionosphere II*); *United Steelworkers of Am. v. Unimet Corp. (In re Unimet)*, 842 F.2d 879, 881 (6th Cir.1988), *cert. denied*, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988). Among other things, section 1113 contains a timetable and outlines an exclusive process by which a debtor may seek to modify or reject a collective bargaining agreement. 11 U.S.C. § 1113. Section 1113 was intended to preclude employers from using a threat of bankruptcy, and a subsequent unilateral rejection of the collective bargaining agreement, as leverage in labor contract negotiations. *See Roth American* at 957; *Shugrue v. Air Line Pilots Ass'n, Intel (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984 (2nd Cir.1990) (hereinafter referred to as *"Ionosphere I"*), *cert. denied*, 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991).

#### b. *"Wage Claim" Priority under the Code*

Section 507(a)(1) of the Code provides that "[f]irst [priority is given to] administrative expenses allowed under section 503(b) ...." 11 U.S.C. § 507(a)(1). In turn, section 503(b)(1) provides that administrative expenses include "the actual, necessary costs and expenses of preserving the estate, *including wages, salaries, or commissions for services rendered after the commencement of the case.*" 11 U.S.C. § 503(b)(1)(A)(emphasis added). Section 507(a)(3) of the Code provides a third priority (behind section 503(b) administrative expenses and section 502(f) expenses) for allowed unsecured claims of up to $4,300 per individual for wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual within 90 days of bankruptcy. *See* 11 U.S.C. § 507(a)(3); 11 U.S.C. § 104.

#### c. *The Effect of Section 1113 on the Priority of Claims*

Although the Fifth Circuit has not addressed this issue, other Circuits have come to different conclusions regarding the effect of section 1113 on the priority of claims arising under collective bargaining agreements in bankruptcy cases. These cases will be discussed in detail.

In *Unimet,* the debtor closed its manufacturing plant and laid off all of its union employees prior to its bankruptcy filing. 842 F.2d at 880. After its bankruptcy filing, the debtor requested the union's consent to the elimination of health and life insurance benefits for retirees (which was the debtor's only remaining obligation under the collective bargaining agreement). *Id.* The union rejected the debtor's request, and the debtor responded by filing a motion to reject the collective bargaining agreement under section 1113. *Id.* The bankruptcy court denied the motion because the debtor failed to carry its burden of proof under section 1113. *Id.*

To protect itself from the possibility that other creditors would challenge an attempt to pay the insurance premiums required under the collective bargaining agreement, the debtor filed an application to pay the insurance premiums as an administrative expense. *Id.* However, the debtor then argued that the insurance premiums could not properly be characterized as an administrative expense. *Id.* The union argued that because section 1113 applies to all provisions of a collective bargaining agreement, the debtor's failure to carry its burden of proof under subsection 1113(b) rendered it liable for premium payments under the terms of the contract. *Id.* The bankruptcy court disagreed, concluding that retirees were not "employees" under section 1113 and that the obligation to pay the insurance premiums was not an administrative expense because it did not arise after the bankruptcy petition was filed. *Id.* at 881. The district court ultimately affirmed. *Id.*

On appeal, the Sixth Circuit concluded that because "section 1113 unequivocally prohibits the employer from unilaterally modifying any provision of the collective bargaining agreement," it would "hold that Unimet cannot escape its obligations ... merely because the requirements of section 503 arguably have not been satisfied." *Id.* at 884. Thus, the Circuit required that claims arising under a collective bargaining agreement that had not been rejected or modified in accordance with section 1113 must be paid in full, even though such obligations arose before the bankruptcy petition was filed. *See id.* The Sixth Circuit essentially held that section 1113(f) preempts or trumps the priority scheme of section 507.

Relying on *Unimet,* several district and bankruptcy courts have held that unpaid claims under a collective bargaining agreement that has not been rejected or modified in accordance with section 1113 are entitled to at least an administrative expense status, and perhaps a "super-priority" status which must be paid immediately, even though the requirements of section 503 have not been met. *See, e.g., Eagle, Inc. v. Local No. 537 of United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry of U.S. and Canada, AFL-CIO,* 198 B.R. 637, 639 (D.Mass.1996) (although case converted to chapter 7, all pre-petition claims under the collective bargaining agreement entitled to "super-priority status" because section 1113 trumps section 507); *In re Acorn Bldg. Components Inc.,* 170 B.R. 317, 320–21 (E.D.Mich.1994) (finding both pre- and post-petition benefits had to be paid at the same level of priority as administrative expense claims); *In re Golden Distributors Ltd.,* 152 B.R. 35, 36–37 (S.D.N.Y. 1992) (affirming order holding all claims arising from collective bargaining agreement entitled to "super-priority," subordinate only to the claims of the secured lenders); *In re Energy Insulation Inc.,* 143 B.R. 490, 496–97 (N.D.Ill.1992) (finding all unpaid claims under collective bargaining agreement to be administrative expenses, but that debtor was not required to make immediate payment); *In re Arlene's Sportswear Inc.,* 140 B.R. 25, 27–28 (Bankr.D.Mass.1992) (holding section 1113(f) overrides the priority provisions of section 507); *In re Canton Castings, Inc.,* 103 B.R. 874, 876 (Bankr.N.D.Ohio 1989) (allowing debtor to pay accrued pre-petition vacation payments pursuant to the

terms of the collective bargaining agreement); *In re St. Louis Globe–Democrat Inc.*, 86 B.R. 606, 608 (Bankr.E.D.Mo.1988) (finding that even after case converted to chapter 7, all amounts determined to be post-petition benefits allowed as chapter 11 administrative expense claims); *see also In re World Sales Inc.*, 183 B.R. 872 (9th Cir. BAP 1995) (outstanding obligations under collective bargaining agreement, including liquidated damages, interest and attorneys fees, were post-petition obligations entitled to administrative expense status).

The Second and the Third Circuits have considered and rejected the Sixth Circuit's analysis in *Unimet*, holding instead that benefit claims arising under a collective bargaining agreement that has not been rejected or modified in accordance with section 1113 are subject to the priority scheme and requirements of sections 502, 503 and 507 of the Code. *Roth American*, 975 F.2d at 955; *Ionosphere II*, 22 F.3d at 406.

In *Roth American*, the Third Circuit analyzed the language of section 1113, noted the absence of a provision explicitly addressing the priority afforded to claims arising under a collective bargaining agreement, and concluded that section 1113 simply does not address the priority of claims under a collective bargaining agreement. *Roth American*, 975 F.2d at 956–57. In coming to its conclusion that claims arising under a collective bargaining agreement that has not been modified or rejected in accordance with section 1113 are still subject to the priorities of section 507, the Court contrasted the provisions of sections 1113 and 1114. *See id.* Section 1114(e)(1) provides that the debtor "shall timely pay" retiree benefits and section 1114(e)(2) provides that "[a]ny payment for retiree benefits required to be made ... has the status of an allowed administrative expense as provided in section 503 ...." 11 U.S.C. §§ 1114(e)(1), (2). Thus, while section 1114 contains explicit language mandating payment of, and administrative

expense status for, retiree benefits, section 1113 does not contain any such language. *See* 11 U.S.C. §§ 1113, 1114. That Congress could have included such provisions in section 1113 but did not was significant to the Third Circuit's holding that only those benefits earned under a collective bargaining agreement for services rendered after the commencement of the case will be entitled to an administrative expense priority in accordance with section 507(a)(1). *See Roth American*, 975 F.2d at 956. In coming to this decision, the Third Circuit harmonized the application of all relevant provisions of the Code. *See also Shipwrights, Joiners and Caulkers Local 2071 v. Uniflite, Inc. (In re Murray Industries, Inc.)*, 110 B.R. 585, 587 (Bankr. M.D.Fla.1990) ("The fact that Congress failed to include similar language in § 1113, which would have created an exemption for immediate payment of any wages of [sic] benefits due under a collective bargaining agreement, is evidence that Congress did not intend § 1113 to be exempt from the operation of other sections of the Code, including the priorities set forth in § 507(a)."), *vacated as moot*, 140 B.R. 298 (M.D.Fla.1992).

Both before and after the decision in *Roth American*, the Second Circuit considered the meaning of section 1113(f) under different circumstances. In *Ionosphere I*, the Court addressed the effect of section 1113 on the application of other provisions of the Code, in general, and on the application of the automatic stay provisions of section 362, in particular. *See Ionosphere I*, 922 F.2d 984. Specifically, the Court considered "whether Congress intended in enacting § 1113(f) to preclude the application of the automatic stay provisions of § 362 to any dispute concerning a collective bargaining agreement absent compliance with the provisions of § 1113" (*id.* at 991), and held that section 1113(f) "precludes application of the automatic stay to disputes involving a collective bargaining agreement only when its application allows a debtor unilaterally to terminate or alter

any provision of a collective bargaining agreement."[2] *Id.* at 992. Because applying section 362 would prohibit the union from arbitrating a dispute in accordance with the arbitration clause in the collective bargaining agreement that had not been modified or rejected in accordance with section 1113, the Court concluded that section 362 did not apply to stay the commencement of arbitration ("Eastern contends that a stay of arbitration does not deprive a union of a forum in which to enforce the collective bargaining agreement. That argument ignores the fact that adjudication of this dispute in the bankruptcy court would nullify effectively the arbitration clause in the collective bargaining agreement and would substitute the court's judgment for that of the arbitrator." *See id.*), but that section 362 did apply to stay an action brought by the union to enjoin the debtor from "wet-leasing" certain aircraft to replace debtor aircraft that were grounded as a result of striking union employees. *Id.*

Although *Ionosphere I* did not address the relationship between section 1113 and section 507, in *Ionosphere II*, the Second Circuit specifically addressed the question of "whether ... section 1113(f) of the Code preempts the application of the priority scheme of section 507." *See Ionosphere II*, 22 F.3d at 406. The Court analyzed the relationship between section 1113(f) and section 507, reconciled those sections, and held that

> Section 1113 does not address the priority to be accorded claims arising from a debtor's obligations under a [collective bargaining agreement]. We must therefore assume that Congress intended that the priorities set forth in section 507 should apply to these claims. When Congress has intended to alter the general priority scheme, it has done so explicitly.

*Id.* at 408. In reaching its decision, the Court rejected *Unimet* and adopted the reasoning of *Roth American.*

The analysis and reasoning of *Roth American* and *Ionosphere II* have been relied upon by other courts to deny "super-priority" or administrative claim status to claims arising under collective bargaining agreements not yet modified or rejected in accordance with section 1113. *See, e.g., In re Family Snacks, Inc.*, 249 B.R. 915, 922 (Bankr.W.D.Mo.2000) (characterizing as the "better view" *Ionosphere II's* holding that section 1113 was not enacted to re-order the priority in which claims would be paid); *Jordan v. Rayman, Martin & Fader, Inc. (In re Rayman, Martin & Fader, Inc.)*, 170 B.R. 286, 289–91 (D.Md.1994) (concluding that section 1113 does not establish a super-priority for a union's claims under a collective bargaining agreement, although claims may be eligible for a third priority under section 507); *Barto Tech. Servs. Inc. v. Persons Listed on Exhibit A–1 of the Objection (In re Wean, Inc.)*, 171 B.R. 528, 531–32 (Bankr.W.D.Pa.1994) (capping any severance pay claims attributable to the 90 days pre-petition at the statutory third priority amount, with any amounts in excess of the priority limit constituting general unsecured claims); *In re Leslie Fay Cos., Inc.*, 168 B.R. 294, 302–03 (Bankr.S.D.N.Y.1994) (observing that the *Ionosphere II* court held that section 1113 was not irreconcilable with, and thus did not supersede, section 507); *cf. Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 330 (8th Cir. 1997) (noting the holding in *Ionosphere II*, and concluding that section 1113 would not supersede the avoidable preference provisions of section 547).

### 2. *The CBA Claims in this Case.*

■ The Union contends that because the Debtor did not modify or reject the

---

2. The Court also held that section 1113(f) "was meant to prohibit the application of any other provision of the Bankruptcy Code when such application would permit a debtor to achieve a unilateral termination or modification of a collective bargaining agreement without meeting the requirements of § 1113." *Id.* at 990–991.

CBA in accordance with section 1113, the Debtor is "bound" by the CBA and all amounts "owing under the agreement . . . must be paid in accordance with the agreement." *See* Union Brief at p. 2. Relying on the Sixth Circuit's decision in *Unimet*, the Union contends that the Debtor is "required by 11 U.S.C. § 1113(f) to pay the accrued wages, expenses, benefits and vacation owing to the [Union Employees] . . ." and that "[t]he priority status of these claims under § 503 or § 507 is not relevant to Kitty Hawk's obligation." *See* Union Brief at pp. 8–9.

The Court disagrees and will follow the reasoning and analysis of the Third Circuit in *Roth American* and the Second Circuit in *Ionosphere II* in holding that the application of the priority scheme of section 507 does not allow Kitty Hawk to unilaterally modify or terminate its obligations under the CBA in violation of section 1113(f). Kitty Hawk's obligations under the CBA will be respected, but the financial obligations issuing from it will be accorded priority consistent with section 507 of the Code. If Congress intended to mandate the "timely" payment of benefits to the Union Employees with the status of administrative claims under section 503, it should have done so expressly, as it did in section 1114(e)(1) and (2) for retiree benefits.

When the priority scheme of section 507 is applied here, the Court concludes that the CBA Claims are not administrative claims in accordance with section 503(b) because the Union Employees provided no services to the Debtor under the CBA after the commencement of the bankruptcy case. The Debtor ceased all flight operations and terminated the Union Employees prior to its Chapter 11 filing. While the Union may have claims against the Debtor under the CBA prior to its modification and assignment pursuant to the Agreed Modification and Assignment Order, the CBA Claims are not entitled to a first priority under section 507(a)(1). At most, the Union has unsecured claims against the Debtor that are entitled to a third priority under section 507(a)(3) and/or a fourth priority under section 507(a)(4). To the extent any individual claim exceeds the dollar limitations for a third and/or fourth priority, the claim is a general unsecured claim against the Debtor.

█ The Court chooses to follow the *Roth American* and *Ionosphere II* courts because their decisions are consistent with this Court's view of its obligation to avoid construing the Code in a fashion that creates conflict between and among the various provisions of the Code or a reading of the Code that causes one section (here, section 1113) to nullify other sections (sections 503 and 507). A construction of sections 1113(f) and 507 that harmonizes or reconciles those sections is preferred to one that causes one section to preempt or ignore another.

## C.  *The WARN Act Claims*

### 1.  *The Statutory Standards*
#### a.  *The WARN Act*

The WARN Act was passed in 1988 to provide protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs, thereby providing some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market. *See* 20 C.F.R. § 639.3.

With certain exceptions, the WARN Act requires covered employers to provide their employees with advance notice of a plant closing or a mass layoff. *See id.* Specifically, the WARN Act states that "[a]n employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order . . . to each

affected employee...."[3] 29 U.S.C. § 2102(a)(1).

An employer's failure to provide the statutory notice gives rise to a claim for statutory damages—essentially back pay for each day of violation at a rate of compensation not less than the higher of (a) the average regular rate received by such employee during the last 3 years of the employee's employment; or (b) the final regular rate received by such employee. See 29 U.S.C. § 2104. According to the Act, "[s]uch liability shall be calculated for the period of the violation, up to a maximum of 60 days...." See 29 U.S.C. § 2104(a)(1)(B). The remedies provided by the WARN Act constitute the exclusive remedies for any violation of its provisions. See 29 U.S.C. § 2104(b).

The WARN Act contains exceptions to the notice requirement, including the "unforeseeable business circumstances exception," that excuses an employer from providing more notice if its closing is not reasonably foreseeable 60 days in advance, see 29 U.S.C. § 2102(b)(2)(A), and the "faltering business exception," that permits an employer to withhold notice if it is actively seeking capital or business that would allow it to postpone or avoid closing and reasonably believes that giving notice would prevent it from obtaining capital or business.[4] See 29 U.S.C. § 2102(b)(1).

### b. *"Wage Claim" Priority under the Code*

As stated previously, section 507(a)(3) of the Code provides a third priority of payment (after section 503(b) administrative expenses and section 502(f) expenses) for allowed unsecured claims of up to $4,300 per individual for wages, salaries, or com-missions, including vacation, severance, and sick leave pay earned by an individual within 90 days of bankruptcy. See 11 U.S.C. § 507(a)(3); 11 U.S.C. § 104. Under section 507(a)(1) and section 503(b), wages, salaries, or commissions for services rendered *after* the commencement of the case that were necessary to preserve the estate are accorded a first priority. See 11 U.S.C. § 503(b)(1)(A); 11 U.S.C. § 507(a)(1).

### 2. *The WARN Claims in this Case*

██ The Union contends that the WARN Claims are "entitled to administrative priority treatment because [they] are severance in lieu of notice and because the Debtors chose to incur that liability rather than continue [Kitty Hawk's] operation for 60 days following the April 29, 2000 notice." See Union Brief at pp. 21–22. The Union cites decisions from three Circuit Courts of Appeal in support of that proposition: *In re Campo Electronics Inc. v. Ross*, 247 B.R. 646, 651 (E.D.La.1998) (*citing Roth American*, 975 F.2d at 957); *In re Health Maintenance Foundation*, 680 F.2d 619 (9th Cir.1982); and *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir. 1976). The Union further contends that "[h]ad the Debtors continued the [Kitty Hawk] operation for the 60–day period necessary to avoid liability, the wages earned during that post-petition period would unquestionably be administrative expenses: The WARN Act pay due to the crewmembers, · therefore, reflects wages for the post-petition period following notice by [Kitty Hawk]" that is entitled to administrative priority treatment. See Union Brief at pp. 22–23. Pleading in the alternative, the Union contends that if the

---

**3.** The statute defines "plant closing" as the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding any part-time employees. See 29 U.S.C. § 2101(a)(2). The statute defines "mass layoff" as a reduction in force which is not the result of a plant closing and results in a given level of employment loss at the single site of employment during a 30–day period. See 29 U.S.C. § 2101(a)(3).

**4.** The Debtor asserted the unforeseeable business circumstances and faltering business exceptions as affirmative defenses to the Complaint, but has not urged them as part of the Motion.

WARN Claims are general unsecured claims not entitled to administrative status, applicable non-bankruptcy law (here, Michigan state law) grants them a preferred payment status over other unsecured creditors. *See Union Brief* at p. 23; MICH. COMP. LAWS. ANN. § 408.511 (West 1983).

For the reasons discussed below, the Court disagrees. When the priority scheme of section 507 is applied here, the Court concludes that the WARN Claims are not administrative claims in accordance with section 503(b) because the Union Employees provided no services to the Debtor after the commencement of the bankruptcy case. The Debtor ceased all flight operations and terminated the Union Employees prior to its Chapter 11 filing. While the Union may have claims against the Debtor under the WARN Act, the WARN Claims are not entitled to a first priority under section 507(a)(1). At most, the Union has unsecured claims against the Debtor that are entitled to a third priority under section 507(a)(3). To the extent the WARN Claims exceed the dollar limitations for a third priority, the claims are general unsecured claims against the Debtor.

In *In re Cargo, Inc.*, 138 B.R. 923 (Bankr.N.D.Iowa 1992), the employer notified its employees that it would cease business operations at the end of the day and that all employees would be terminated at that time. *Id.* at 925. As such, the employer did not give its employees the sixty-day advance notice required by the WARN Act. Forty-two days later, the employer filed chapter 7 and the trustee began liquidating assets. *Id.*

Various employees filed claims for unpaid wages pursuant to the provisions of WARN Act and asked that their claims be given priority status under section 507(a)(3) as wages earned within 90 days of the debtor's cessation of business. *Id.* The trustee objected to the claims, contending, *inter alia*, that the claims were statutory penalties, not wages entitled to priority under the Code. *Id.*

The bankruptcy court concluded that "[g]iven the purposes of the WARN Act, ... it is remedial, not punitive in nature. The 'back pay' liability of the employer is comparable to privately negotiated severance pay. It is severance pay in lieu of notice, imposed by statute. It is a 'quasi contractual' obligation." *Id.* at 927. As a statutorily imposed form of severance pay, the court concluded that "WARN claims constitute wages earned by the claimants within 90 days of the cessation of debtor's business. They are entitled to priority status under § 507(a)(3)." *Id.* at 925–26. Moreover, the court concluded that the employees "earned the WARN pay upon termination." *Id.* at 928.

Here, the Union Employees were terminated pre-petition without the 60–day notice required by the WARN Act. The Court agrees with the conclusions of the *Cargo* court—the WARN pay was earned upon termination (prior to the Debtor's Chapter 11 filing). At most, the WARN Claims constitute wages earned by the Union Employees within 90 days of the cessation of the Debtor's business and are entitled to priority status under section 507(a)(3).

Moreover, the cases relied upon by the Union for its proposition that a severance in lieu of notice provision entitles a terminated employee to an administrative expense claim in bankruptcy are inapposite. In each of those cases, the debtor terminated the employee/claimant after it filed bankruptcy. Thus, the employee/claimant earned the WARN pay upon their post-petition termination by the debtor. As noted previously, here, because the Debtor terminated the Union Employees pre-petition, the WARN pay was necessarily "earned" pre-petition.

The Michigan statute cited by the Union would give employees a preference over other general unsecured creditors when the business of their employer is suspended by the action of creditors or is placed in the custody of a receiver or trustee. *See* MICH. COMP. LAWS.

ANN. § 408.511 ("When the business of a person or entity is suspended by the action of creditors, or is placed in the custody of a receiver or trustee, debts owed to or for the benefit of employees of the business ... which have accrued by reason of their employment ... are preferred claims. Such employees ... are preferred creditors and shall be first paid in full before other unsecured creditors are paid."). The Union maintains that because the Debtor maintained its principal place of business in Michigan, the Debtor is bound by this statute to pay the Union Employees in full prior to any general unsecured creditors. *See* Union Brief at p. 23.

*Ab initio*, the statute is inapplicable to this case because the business of the Debtor has neither been "suspended by the action of creditors" nor "placed in the custody of a receiver or trustee ...." *See* MICH. COMP. LAWS. ANN. § 408.511. More importantly, the Michigan statute is not applicable because it was pre-empted by the Code upon the Debtor's Chapter 11 filing.

Although the nature of a creditor's claim is determined under state law, the Code establishes the priorities of claims. *See* 11 U.S.C. § 507; *Ohio v. Kovacs*, 469 U.S. 274, 285–86, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) (O'Connor, concurring); *In re Southwestern Fabricators, Inc.*, 40 B.R. 790, 791 (Bankr.W.D.Tex. 1984) ("State law is determinative on the issue of entitlement to property rights while federal bankruptcy law is relevant on the issue of priorities of rights."). Where a state statute would alter the priority of claims in a bankruptcy case, the state statute is pre-empted by the Code. *See In re Lull*, 162 B.R. 234, 240 (Bankr.D.Minn. 1993) ("A state statute cannot reset bankruptcy priorities."); *In re Cropper Co., Inc.*, 63 B.R. 874, 876 (Bankr.M.D.Ga.1986) ("The Court recognizes that Georgia law governs the priority of liens in a nonbankruptcy situation. When a bankruptcy has been filed, however, the priority of liens as set forth by Congress in the Bankruptcy Code governs."); *In re Redford*, 54 B.R.

254, 255 (Bankr.N.D.Ill.1985) ("Priority of distribution in a bankruptcy case is governed exclusively by sections 507 and 726 of the Bankruptcy Code."); *see also* 4 COLLIER ON BANKRUPTCY ¶ 507.02[3][a] (rev. 15th ed.2000) ("To the extent that a state statute purports to establish the priority of a claim over other claims, that statute is pre-empted by the [Bankruptcy] Code and of no effect on the bankruptcy case."). Thus, the priority of the Union Employees' claims is determined under the Code.

For these reasons, the Debtor is entitled to a summary judgment that the CBA Claims and the WARN Claims are subject to the priorities of the Code. At most, the Union has asserted claims that are entitled to priority under section 507(a)(3) and/or (4) of the Code. If the allowed CBA Claims exceed the priority limitations of section 507(a)(3) and/or (4) of the Code, the CBA Claims are general unsecured claims against the Debtor. If the allowed WARN Claims exceed the priority limitation of section 507(a)(3), the WARN Claims are general unsecured claims against the Debtor.

A partial summary judgment in the Debtor's favor will be entered separately.