**In re CERTIFIED AIR
TECHNOLOGIES,
INC., Debtor.**

**No. RS 02–28854 PC.**

United States Bankruptcy Court,
C.D. California,
Riverside Division.

Sept. 30, 2003.

Naomi R. Bernstein, Bernstein Law Corporation, Rancho Cucamonga, CA, for Certified Air Technologies, Inc.

Laurie A. Traktman, Gilbert & Sackman, Los Angeles, CA, for Airconditioning and Refrigeration Industry Trust Funds, Sheet Metal Trust Funds, and the Pipe Trades Trust Funds.

## MEMORANDUM DECISION

PETER H. CARROLL, Bankruptcy Judge.

On September 2, 2003, the court conducted a hearing on the objections of Certified Air Technologies, Inc. ("CAT") to the following proofs of claim pursuant to Fed. R.Bankr.P. 3007: (a) Proof of Claim of the Airconditioning and Refrigeration Industry Trust Funds [1] dated July 9, 2003, as amended on August 13, 2003; (b) Proof of Claim of the Sheet Metal Trust Funds [2] dated July 9, 2003, as amended on August 13, 2003, and (c) Proof of Claim of the Pipe Trades Trust Funds [3] dated July 9, 2003, as amended on August 13, 2003. Naomi Bernstein appeared for CAT, and Laurie A. Traktman appeared for the Airconditioning and Refrigeration Industry Trust Funds ("ARITF"), Sheet Metal Trust Funds ("SMTF"), and the Pipe Trades Trust Funds ("PTTF"). The court, having considered the proofs of claim and CAT's objections thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law.[4]

## I. *STATEMENT OF FACTS*

CAT is a California corporation which has done business as a heating and air conditioning contractor in Chino, California, since 1989. On November 20, 2002, CAT filed its voluntary petition for reorganization under chapter 11 in this case. At the time of bankruptcy, CAT was a party to a collective bargaining agreement with each of the following entities with respect to its employees: (a) Sheet Metal Workers' International Association, AFL–CIO, Local No. 108; (b) United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry, AFL–CIO, Local No. 250, and (c) Southern California Pipe Trades District Council No. 16 of the United Association of Journeymen and Apprentices of the Plumbing

---

1. Board of Trustees of the Airconditioning and Refrigeration Industry Health and Welfare Trust Fund; Board of Trustees of the Airconditioning and Refrigeration Industry Retirement Trust Fund; Board of Trustees of the Airconditioning and Refrigeration Industry Defined Contribution Retirement Plan; Board of Trustees of the Piping Industry Progress and Education Labor & Management Cooperation Committee Trust Fund; the Promotion Fund; the Training Fund; the Administrative Dues Fund, and the Industry Recovery Fund (collectively, the "Airconditioning and Refrigeration Industry Trust Funds").

2. Board of Trustees of the Sheet Metal Workers Pension Plan of Southern California, Arizona and Nevada; Sheet Metal Workers Health Plan of Southern California, Arizona and Nevada; Sheet Metal Workers Local 108 Section 401(k) Plan; Sheet Metal Workers

Savings Plan of Southern California; Los Angeles Sheet Metal Workers' Joint Apprenticeship Training Committee; Sheet Metal Workers Supplemental Retirement Income Joint Welfare Trust Fund, and Sheet Metal Industry Fund of Los Angeles (collectively, the "Sheet Metal Trust Funds").

3. Board of Trustees of the Plumbers and Pipefitters National Pension Fund and the International Training Fund (collectively, the "Pipe Trades Trust Funds").

4. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

and Pipe Fitting Industry, AFL–CIO. CAT has not rejected any of its collective bargaining agreements pursuant to 11 U.S.C. § 1113.

ARITF, SMTF and PTTF are multi-employer "employee benefit plans" created and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(c)(5), and the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.* Each of the trust funds provides some sort of health, pension, vacation, educational, or similar benefit to CAT's employees. The trust funds are funded by employer contributions and payroll deductions.[5] CAT is required by the collective bargaining agreements to make timely and adequate contributions on behalf of its employees.[6] CAT defaulted in the payment of employee benefit fund contributions prior to bankruptcy. ARITF, SMTF and PTTF seek the allowance of claims for unpaid *pre-petition* employee benefit fund contributions, plus liquidated damages and attorneys fees.

### A. SMTF's Claim

SMTF asserts an administrative claim of $2,492.53 in unpaid employee benefit plan contributions accruing prior to bankruptcy, plus liquidated damages of $4,405.62 and $5,000 in attorneys fees. SMTF argues that § 1113(f) entitles its pre-petition claim for delinquent benefit plan contributions to treatment as an administrative expense because the claim resulted from CAT's breach of an unrejected collective bargaining agreement. CAT objects to the claim, arguing that a debt incurred pre-petition cannot be allowed as an administrative expense. CAT asserts that SMTF's claim for unpaid employee benefit contributions of $2,492.53, which accrued within 180 days before the filing of the petition, should be allowed as an unsecured priority claim under § 507(a)(4), and that its claim for liquidated damages and attorneys fees totaling $9,405.62 should be allowed as a general unsecured claim.

### B. PTTF's Claim

Pursuant to § 1113(f), PTTF seeks an administrative claim of $17,093.41 [7] for delinquent pre-petition employee benefit plan contributions, plus liquidated damages of $1,856.88 and $5,000 in attorneys fees [8]. CAT objects to the claim, arguing that

---

5. CAT's monthly contributions to each trust fund is calculated by multiplying the total number of hours worked by CAT's employees during the reporting period with the hourly contribution rate set forth in the collective bargaining agreement. *Response to Debtor's Objections to the Proofs of Claims for the Airconditioning and Refrigeration Industry Trust Funds, Sheet Metal Workers Trust Funds, and Plumbers and Pipefitters National Pension Plan and International Training Fund,* p. 3, 1.10–14.

6. If contributions are delinquent, CAT is liable for liquidated damages of at least 10% of the delinquent amount pursuant to the terms of its collective bargaining agreements. CAT is also liable under the collective bargaining agreements and trust fund agreements for costs incurred in connection with the collec-

tion of any contributions, liquidated damages or late filing assessments by the trust funds, including interest and attorneys fees. *Response to Debtor's Objections to the Proofs of Claims for the Airconditioning and Refrigeration Industry Trust Funds, Sheet Metal Workers Trust Funds, and Plumbers and Pipefitters National Pension Plan and International Training Fund,* p. 4, 1.1–9.

7. In its amended proof of claim, PTTF asserted a claim for $18,797.36 in unpaid pre-petition plan contributions. At the hearing, the amount was corrected and reduced to $17,093.41 by agreement of the parties.

8. There is a conflict in PTTF's amended proof of claim between the $1,500 attorneys fees requested in paragraph 7c and the $5,000 amount sought in paragraph 8c. The Decla-

PTTF's claim for delinquent benefit contributions of $17,093.41, which accrued within 180 days before the filing of the petition, should be allowed as an unsecured priority claim pursuant to § 507(a)(4), and that its claim for liquidated damages and attorneys fees totaling $6,856.88 should be allowed as a general unsecured claim.

## C. *ARITF's Claim*

ARITF seeks allowance of a $156,-538.67[9] administrative claim under § 1113(f), consisting of unpaid pre-petition employee benefit plan contributions of $135,179.50, liquidated damages of $12,359.17, and attorneys fees of $9,000. CAT objects, contending that ARITF's claim is subject to § 507. CAT contends that contributions of $10,589.87[10] for vacation and holiday benefits accruing to the "Vacation Account" within 90 days prior to bankruptcy should be allowed under § 507(a)(3), and the remaining plan contributions of $124,589.63 accruing within 180 days before the filing of CAT's petition are entitled to priority under § 507(a)(4). CAT further contends that ARITF's claim for liquidated damages and attorneys fees totaling $21,359.17 should be classified as a general unsecured claim.

In the alternative, ARITF asserts that $45,574.52 of its claim for unpaid pre-petition benefit payments represents delinquent contributions to a pooled account used to provide medical benefits to CAT's employees, including retirees. ARITF reasons that the $45,574.52 should be allowed as an administrative expense under § 1114(e)(2) because "an unsegregated and undivided portion of CAT's delinquent contributions constitute retiree benefits within the meaning of § 1114(a)." CAT objects to treatment of the ARITF's pre-petition claim for health plan contributions as an administrative expense under § 1114(e)(2), arguing that the statute relates to payments made by the debtor to retirees, not to deposits into a pooled health plan that provides medical benefits to active and retired employees.

CAT concedes that ARITF, SMTF and PTTF (hereinafter, the "Trust Funds") have valid claims for vacation pay and unpaid pre-petition plan contributions. The issue before the court is the priority to be accorded the claims. The Trust Funds argue that § 1113, which controls the assumption or rejection of collective bargaining agreements in chapter 11 cases,[11] establishes a "superpriority" status

---

ration of Laurie A. Traktman attached to PTTF's amended proof of claim supports an allowance of $5,000 in attorneys fees. At the hearing, CAT did not oppose attorneys fees of $5,000 so long as the amount was allowed only as a general unsecured claim.

9. The court previously allowed the amounts sought in paragraphs 8d and 9 of ARITF's amended claim. On May 22, 2003, the court entered an Order Granting Trust Funds' Motion to Compel Payment of Administrative Expenses allowing ARITF's claim for unpaid *post-petition* employee benefit plan contributions of $6,772.08, $167.05 in liquidated damages, interest of $44.78, $1,750 attorneys fees, and costs of $500.75, as an administrative expense in this case. *See Teamsters Indus. Sec. Fund v. World Sales, Inc. (In re World*

*Sales, Inc.)*, 183 B.R. 872, 878 (9th Cir. BAP 1995).

10. At the hearing, CAT and ARITF stipulated to reduction of the amount claimed for delinquent Vacation Account contributions from $13,037.57 to $10,589.87.

11. Section 1113 does not apply to cases pending under chapter 7 or chapter 9. *See, e.g., Carpenters Health & Welfare Trust Funds v. Robertson (In re Rufener Constr., Inc.)*, 53 F.3d 1064, 1068 (9th Cir.1995) (holding § 1113 inapplicable to chapter 7 cases); *Orange County Employees Ass'n v. County of Orange (In re County of Orange)*, 179 B.R. 177, 183 (Bankr.C.D.Cal.1995) (stating that Congress did not change chapter 9 to make § 1113 applicable).

for wage and benefit claims arising out of collective bargaining agreements. According to the Trust Funds, all unpaid employee benefit plan contributions due under CAT's collective bargaining agreements are entitled to treatment as administrative expenses, regardless of whether the benefits were earned pre-petition or post-petition. Trust Funds contend that CAT's pre-petition breach of its collective bargaining agreements unilaterally altered the terms of such agreements in violation of § 1113(f) and that CAT's modification can be remedied only by immediate and full payment of the pre-petition delinquencies as administrative expenses in this case.[12] CAT disagrees, claiming that § 507's priority scheme is not superceded by § 1113(f).

## II. ISSUES

1. Whether § 1113(f) trumps the priorities established by Congress in § 507.

2. Whether ARITF's claim of $45,574.52 for delinquent pre-petition contributions to the Airconditioning and Refrigeration Industry Health and Welfare Trust Fund ("Health Fund"), a multi-employer pooled account used to provide medical benefits to employees and retirees, should be allowed as an administrative expense under § 1114(e)(2).

## III. DISCUSSION

### A. Section 507(a)(1)

Section 507(a) creates nine categories of priority claims. Administrative expenses allowed under § 503(b), including wages, salaries, or commissions for services rendered after the commencement of the case, are entitled to first priority under § 507(a)(1).[13] Section 507(a)(3) contains a priority for wages, salaries and commissions, including vacation and severance pay, up to $4,650 per individual, provided the amounts are earned within ninety days before the earlier of the filing of the petition or the date of the cessation of the debtor's business.[14] Allowed unsecured claims for contributions to an employee benefit plan are entitled to priority under § 507(a)(4), so long as the contributions are attributable to services rendered within 180 days before the earlier of the date of the filing of the petition or the date of the cessation of the debtor's business.[15]

---

**12.** With the exception of ARITF's claim under § 1114(e)(2), Trust Funds concede in their respective proofs of claim that § 507 governs the allowance of their pre-petition claims and that CAT's position is correct absent a finding that § 1113(f) overrides § 507's priority scheme.

**13.** 11 U.S.C. § 507(a)(1).

**14.** Section 507(a)(3) provides:

Third, allowed unsecured claims, but only to the extent of $4,650 for each individual or corporation, as the case may be, earned within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for—
   (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; ....

11 U.S.C. § 507(a)(3). Not all employee benefits are entitled to priority treatment under § 507(a)(3). *See In re Baldwin–United Corp.*, 52 B.R. 549, 552 (Bankr.S.D.Ohio 1985) (holding that a cash guarantee relating to a stock option plan was outside the scope of § 507(a)(3)); *Keim v. Growers Seed Ass'n (In re Keim)*, 49 B.R. 17, 18 (Bankr.N.D.Tex. 1985) (holding that § 507(a)(3) did not extend to a claim for reimbursement of moving expenses).

**15.** Section 507(a)(4) states:

Fourth, allowed unsecured claims for contributions to an employee benefit plan—
   (A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
   (B) for each such plan, to the extent of—

Because the amount payable to employee benefit plans under § 507(a)(4) is reduced dollar-for-dollar by the amounts allowed to employees under § 507(a)(3), the priority established for employment related claims does not exceed $4,650.[16]

**B.  *Section 1113.***

■ Section 1113 was enacted by Congress in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In *Bildisco,* the Supreme Court held that a collective bargaining agreement could be rejected in chapter 11 once it was established that the agreement "burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *Id.* at 526, 104 S.Ct. 1188. Congress added section 1113 to prevent "employers from using a threat of bankruptcy, and a subsequent unilateral rejection of the collective bargaining agreement, as leverage in labor contract negotiations." *Int'l Bhd. of Teamsters v. Kitty Hawk Int'l, Inc. (In re Kitty Hawk, Inc.),* 255 B.R. 428, 432 (Bankr.N.D.Tex.2000). *See Century Brass Prods., Inc. v. Int'l Union, United Auto. Aerospace and Agric. Implement Workers (In re Century Brass Prods., Inc.),* 795 F.2d 265, 272 (2nd Cir.1986) (stating that § 1113 "created an expedited form of collective bargaining with several safeguards designed to insure that employers did not use Chapter 11 as a medicine to rid themselves of corporate indigestion"); *United Food & Commercial Workers Union, Local 770 v. Official Unsecured Creditors Comm. (In re Hoffman Bros. Packing Co.),* 173 B.R. 177, 182 (9th Cir. BAP 1994) (noting that " § 1113 was intended to overturn *Bildisco's* 5–4 decision allowing unilateral rejection of a CBA by a Chapter 11 debtor, and to resolve the debate over the standard to be adopted for authorizing rejection by the court").

■ Section 1113 is designed to "protect employees during the interim between the filing of the bankruptcy petition and court-supervised modification or ultimate rejection" of a labor contract. *World Sales,* 183 B.R. at 878. Rejection of a collective bargaining agreement is prohibited absent strict compliance with the substantive and procedural requirements of the statute.[17]

Congress specifically provided in § 1113(f) that:

> "No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."

11 U.S.C. § 1113(f). However, a split of federal circuit authority exists as to whether § 1113(f) trumps the priorities established by Congress in § 507. *Compare*

(i) the number of employees covered by each such plan multiplied by $4,650; less (ii) the aggregate amount paid to such employees under [§ 507(a)(3)], plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.
11 U.S.C. § 507(a)(4).

**16.**  *See* 11 U.S.C. § 507(a)(4)(B).

**17.**  Section 1113 states:
(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act [45 U.S.C. §§ 151 et seq.], may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.
11 U.S.C. § 1113(a).  *See generally, 7 Collier on Bankruptcy* ¶ 1113.02, at 1113–7 (Alan N. Resnick & Henry J. Sommers eds., 15th ed. rev.2003).

*United Steelworkers of Am. v. Unimet Corp. (In re Unimet Corp.),* 842 F.2d 879, 884 (6th Cir.1988), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988) (stating that § 1113 "unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement"), *with Adventure Res., Inc. v. Holland,* 137 F.3d 786, 797 (4th Cir. 1998) (holding that § 1113(f) does not supercede the priorities embodied in § 507), *Air Line Pilots Ass'n, Int'l v. Shugrue (In re Ionosphere Clubs, Inc.),* 22 F.3d 403, 406 (2nd Cir.1994) (stating that application of § 507's priority scheme does not conflict with the goal of § 1113), *and In re Roth Am., Inc.,* 975 F.2d 949, 958 (3rd Cir.1992) (holding that § 1113 does not create a superpriority for claims arising from an unrejected collective bargaining agreement).

## C. *The Unimet Approach*

In *Unimet,* the debtor filed under chapter 11 ten months after closing its manufacturing plant and laying off all union represented employees. At that time, the debtor's only remaining obligation under its collective bargaining agreement was the payment of insurance premiums on behalf of the retirees. After the bankruptcy court denied its request to reject the collective bargaining agreement, the debtor sought permission to terminate payment of the insurance premiums. The bankruptcy court granted the motion, holding that § 1113 did not apply to retirees and that the insurance premiums did not meet the criteria for treatment as administrative expenses under § 503(b). *Unimet,* 842 F.2d at 880–81. The district court affirmed. *Id.* at 881. The Sixth Circuit reversed, holding that because "section 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement," the debtor could not "escape

its obligations in this regard merely because the requirements of section 503 arguably have not been satisfied." *Id.* at 884. In so holding, the Sixth Circuit stated:

In sum, our reading of 11 U.S.C. § 1113 leads us to the conclusion that Congress intended to give broad protection to collectively bargained for rights which are threatened by a corporate reorganization under Chapter 11 of the Bankruptcy Code. Our conclusion that 11 U.S.C. § 1113 applies to all provisions of a collective bargaining agreement does no violence to the plain language of the statute or the legislative history as we perceive it. By requiring the debtor-in-possession to establish that the equities militate in favor of rejection of the benefits collectively bargained for on behalf of retirees, we believe we strike the appropriate balance between the interests of the debtor-in-possession in effectuating a reorganization and the interests of retirees who have achieved through the collective bargaining process some measure of security.

*Id.* at 885–86.

While no other circuit has followed *Unimet,* a number of lower courts relying on *Unimet* have held that § 1113(f) trumps § 507's priority scheme and that unpaid claims under a collective bargaining agreement that has not been rejected or modified under § 1113 are entitled to either "super-priority" status or treatment as administrative expenses. *See, e.g., In re Typocraft Co.,* 229 B.R. 685, 691 (Bankr. E.D.Mich.1999) (concluding that pre-petition obligations under a collective bargaining agreement are entitled to chapter 11 administrative expense status); *Eagle, Inc. v. Local No. 537 of United Ass'n of Journeymen,* 198 B.R. 637, 639 (D.Mass.1996) (stating that § 1113(f) creates a super-

priority for all pre-petition and post-petition payments due under a collective bargaining agreement); *Int'l Union, United Auto., Aerospace and Agric. Implement Workers v. Acorn Bldg. Components, Inc. (In re Acorn Bldg. Components, Inc.)*, 170 B.R. 317, 321 (E.D.Mich.1994) (finding that payment of pre-petition and post-petition wages and benefits under a collective bargaining agreement "at the level of an administrative expense priority is consistent with the plain intent of Congress"); *Metro. Distrib. Serv., Inc. v. Local 1532 OPEIU (In re Golden Distrib. Servs., Inc.)*, 152 B.R. 35, 37 (S.D.N.Y.1992) (holding that post-petition severance pay claims under a collective bargaining agreement were entitled to super-priority treatment, even though the calculation was based in part on pre-petition employment); *Journeymen Plasterers Protective & Benevolent Soc. Local No. 5 v. Energy Insulation, Inc. (In re Energy Insulation, Inc.)*, 143 B.R. 490, 496–97 (N.D.Ill.1992) (finding that unpaid claims under collective bargaining agreements are administrative expenses, but declining to order immediate payment based on language of § 1113); *United Steelworkers of Am. v. Ohio Corrugating Co.*, 1991 WL 213850, *3 (N.D.Ohio 1991) (holding that claims made pursuant to unrejected collective bargaining agreements are entitled to full payment of the bargained for benefits under § 1113(f)); *In re Arlene's Sportswear, Inc.*, 140 B.R. 25, 27–28 (Bankr.D.Mass.1992) (holding that § 1113(f) supercedes the priority scheme in § 507); *In re Canton Castings, Inc.*, 103 B.R. 874, 876 (Bankr.N.D.Ohio 1989) (relying on § 1113(f) to authorize payment of pre-petition vacation benefits due under an unrejected collective bargaining agreement); *In re St. Louis Globe–Democrat, Inc.*, 86 B.R. 606, 609–10 (Bankr.E.D.Mo. 1988) (holding that vacation and severance pay accruing in chapter 11 under an unrejected collective bargaining agreement was allowable as an administrative expense despite conversion to chapter 7).

### D. *The Roth Approach*

The Second, Third and Fourth Circuits have declined to follow *Unimet*, holding instead that § 1113 does not affect the priorities accorded claims under § 507. *See Adventure Res.*, 137 F.3d at 797; *Ionosphere Clubs*, 22 F.3d at 406; *Roth Am.*, 975 F.2d at 955. In *Roth American*, the chapter 11 debtor had not rejected its collective bargaining agreement pursuant to § 1113 and the union sought allowance of all vacation pay and severance pay due under the agreement as an administrative expense, regardless of whether the benefits were earned before or after bankruptcy. The bankruptcy court determined that claims for vacation pay and severance pay earned post-petition were entitled to payment as an administrative expense, but that pre-petition claims for vacation pay and severance pay were only entitled to priority under § 507(a)(3) to the extent earned within ninety days of bankruptcy and the balance constituted general unsecured claims. *Roth Am.*, 975 F.2d at 951. The district court affirmed, finding that "nothing in 11 U.S.C. § 1113 was intended to alter the priority to be accorded such claims." *Id.* The Third Circuit affirmed, holding that § 1113 "does not create a superpriority or automatic first priority for claims under an unrejected collective bargaining agreement." *Id.* at 958. In so holding, the court stated:

> The congressional goal embodied in section 1113 to give special consideration to a collective bargaining agreement and encourage the debtor and the union to reach a mutually acceptable agreement while the provisions of the current agreement remain in effect until the bankruptcy court authorizes unilateral rejection or modification of the agree-

ment pursuant to section 1113 can be satisfied without interfering with the previously established statutory priorities.

*Id.* at 957 (citation omitted).

Two years later, the Second Circuit in *Ionosphere Clubs* followed *Roth,* holding that pre-petition vacation pay claims were unsecured priority claims under § 507(a)(3) rather than administrative expenses. *Ionosphere Clubs,* 22 F.3d at 407. The Second Circuit read § 1113 and § 507 to avoid conflict with each other, observing that:

> "Judicial ordering of benefit claims pursuant to § 507 is not equivalent to employer avoidance of obligations under a collective bargaining agreement. The collective bargaining agreement is respected, but the financial obligations issuing from it are accorded priority consistent with the Bankruptcy Code." Moreover, application of the priority scheme does not conflict with the purpose of section 1113.

*Id.* at 407, *quoting Air Line Pilots Ass'n v. Shugrue (In re Ionosphere Clubs, Inc.),* 154 B.R. 623, 630 (S.D.N.Y.1993) (citation omitted). The Fourth Circuit joined the Second and Third Circuits in *Adventure Res.,* holding that "a bankruptcy claim arising from the breach of a collective bargaining agreement may be accorded priority status only insofar as it fits into one of the categories singled out for preferential treatment in § 507." *Adventure Res.,* 137 F.3d at 797.[18]

Courts adopting the *Roth* approach have denied super-priority or administrative expense status to claims arising under a collective bargaining agreement not yet modified or rejected pursuant to § 1113. *See, e.g., Jordan v. Rayman, Martin & Fader, Inc. (In re Rayman, Martin & Fader, Inc.),* 170 B.R. 286, 291 (D.Md. 1994); *Kitty Hawk,* 255 B.R. at 436; *In re Family Snacks, Inc.,* 249 B.R. 915, 922 (Bankr.W.D.Mo.2000); *Barto Tech. Serv., Inc. v. Persons Listed on Exhibit A–I of the Objection (In re Wean, Inc.),* 171 B.R. 528, 531 (Bankr.W.D.Pa.1994); *In re Spirit Holding Co.,* 157 B.R. 883, 886 (Bankr. E.D.Mo.1993); *In re Moline Corp.,* 144 B.R. 75, 79 (Bankr.N.D.Ill.1992); *In re Armstrong Store Fixtures Corp.,* 135 B.R. 18, 22 (Bankr.W.D.Pa.1992); *Shipwrights, Joiners and Caulkers Local 2071 v. Uniflite, Inc. (In re Murray Indus., Inc.),* 110 B.R. 585, 589 (Bankr.M.D.Fla.1990), *vacated as moot,* 140 B.R. 298 (M.D.Fla.1992).

### E. Ninth Circuit Cases

The Ninth Circuit has yet to rule on the issue of whether § 1113(f) trumps § 507's priority scheme. Trust Funds contend that appellate decisions in the Ninth Circuit favor the *Unimet* approach, citing *Rufener Construction, World Sales* and *Hoffman.* The court disagrees.

In *Hoffman,* the Ninth Circuit Bankruptcy Appellate Panel held that a collective bargaining agreement could not be rejected retroactively under § 1113, and remanded the case to the bankruptcy court for entry of an order allowing wage and

---

**18.** However, the Third Circuit and Fourth Circuit disagree concerning the treatment of delinquent pre-petition employee benefit plan contributions where there is an assumption of the collective bargaining agreement under § 365. *Compare Adventure Res.,* 137 F.3d at 793 (stating that any claims arising from the debtor's failure to cure all default upon assumption of collective bargaining agreement are entitled to first priority as administrative expenses), *with Roth,* 975 F.2d at 958 (holding that debtor's implicit assumption of the collective bargaining agreement required administrative priority for wage and benefit claims only to the extent that the benefits were earned by services rendered post-petition).

benefit claims arising after the date of bankruptcy as administrative expense in the case. *Hoffman,* 173 B.R. at 189. *Cf. San Rafael Baking Co. v. N. Cal. Bakery Drivers Sec. Fund (In re San Rafael Baking Co.),* 219 B.R. 860, 866–67 (9th Cir. BAP 1998) (holding that bankruptcy court had no jurisdiction to award benefit payments under an expired collective bargaining agreement, and allowing an administrative claim only for benefits that accrued during month between filing of petition and expiration of labor contract). Although the debtor had defaulted in contributions prior to bankruptcy, the issue of whether any pre-petition wage and benefit claims were entitled to treatment as administrative expenses under § 1113(f) was not before the court. *See Hoffman,* 173 B.R. at 180.

In *Rufener Construction,* the Ninth Circuit noted a split of authority on the issue of whether § 1113(f) created a super-priority for wage and benefit claims attributable to a collective bargaining agreement. *Rufener Constr.,* 53 F.3d at 1065 n. 1. However, the Ninth Circuit was not required to decide the issue because the only question presented on appeal was whether § 1113(f) applied to chapter 7 proceedings. *Id.* at 1065.

One month later, the Ninth Circuit Bankruptcy Appellate Panel in *World Sales* stated that § 1113(f) preserves post-bankruptcy claims arising under an unrejected collective bargaining agreement. *World Sales,* 183 B.R. at 878. While not directly analyzing the interplay between § 1113(f) and § 507(a), the court held that a claim based on payments due under an unrejected collective bargaining agreement for post-petition work, together with liquidated damages, interest and attorneys fees arising out of the post-petition breach of the agreement, is entitled to treatment as an administrative expense. *Id.* In so holding, the court distinguished *Roth,* stating:

> In *Roth American,* the vacation and severance pay at issue had been earned both before and after the filing of the petition, and therefore, *division of the claims was appropriate.* The court allowed administrative priority claims based on post-bankruptcy work.

*Id.* at 877 (emphasis added). *World Sales* does not embrace *Unimet.* On the contrary, the discussion in *World Sales* concurs with *Roth* and its progeny.

### F. *Statutory Construction*

▮ Statutory construction of the Bankruptcy Code is a "holistic endeavor" requiring consideration of the entire statutory scheme. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The various sections of a legislative enactment must be construed together and harmonized in order to divine a congressional intent that effectuates its purpose. *See, e.g., Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 370, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (arguing that statutory provisions should be read to avoid conflict with each other); *Negonsott v. Samuels,* 933 F.2d 818, 819 (10th Cir.1991) (stating that "every word Congress used" is significant in statutory analysis). If a provision is susceptible of more than one interpretation, the construction adopted should advance the overall statutory policy. *Rake v. Wade,* 508 U.S. 464, 471, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993) (stating that one provision in a statute should not be construed so as to suspend or supercede another provision); *Timbers,* 484 U.S. at 371, 108 S.Ct. 626 (statutory term "that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme," for example, when "only one of the permissible meanings produces a substantive effect that is

compatible with the rest of the law"); *Rufener Constr.*, 53 F.3d at 1067 (stating that words or sub-sections must not be read in isolation, and that meaning must be derived from "reading the relevant statutory provisions as a whole").

▆ The plain language of a statute is conclusive as to its meaning when the statutory scheme is coherent and consistent. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240–41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Where the statute's language is plain, "the sole function of the court is to enforce it according to its terms." *Id.* at 241, 109 S.Ct. 1026; *see Rake*, 508 U.S. at 471, 113 S.Ct. 2187. Any judicial inquiry into the purpose, background or legislative history of the statute is foreclosed unless a literal application of the statute produces "a result demonstrably at odds with the intent of its drafters." *Ron Pair*, 489 U.S at 242, 109 S.Ct. 1026. *Accord Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (stating that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there"). *See generally,* Stephen Breyer, *On the Uses of Legislative History in Interpreting Statutes*, 65 S. Cal. L.Rev. 845, 848–49 (1992).

## G. *Section 1113(f) Does Not Trump § 507*

▆ Collective bargaining agreements are executory contracts. *Bildisco*, 465 U.S. at 522 n. 6, 104 S.Ct. 1188. Section 1113 was enacted to override *Bildisco* and set more rigorous standards in chapter 11 cases for the rejection of collective bargaining agreements than for other executory contracts or leases. *Moline Corp.*, 144 B.R. at 78. Section 1113 is silent, however, as to the impact of assumption, rejection or inaction on the priority of claims arising both pre-petition or post-petition under a collective bargaining agreement.

▆ By focusing on the language of § 1113(f) to the exclusion of other Code provisions, Trust Funds misinterprets the purpose and policy of the statute.[19] There is nothing in the language of § 1113 nor its legislative history [20] to indicate that Con-

---

**19.** Section 1113 cannot be read in isolation. In *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), Justice Scalia warned of the harm in departing from established methods of statutory construction:

> By disregarding well-established and oft-repeated principles of statutory construction, it renders those principles less secure and the certainty they are designed to achieve less attainable. When a seemingly clear provision can be pronounced "ambiguous" *sans* textual and structural analysis, and when the assumption of uniform meaning is replaced by "one-subsection-at-a-time" interpretation, innumerable statutory texts become worth litigating.

*Id.* at 435, 112 S.Ct. 773 (Scalia, J., dissenting). As the court explained in *In re Depew*, 115 B.R. 965 (Bankr.N.D.Ind.1989):

> The Bankruptcy Code is not a fragmented and disconnected collection of miscellaneous rules. It is a complex tapestry of ideas.

> The colors and patterns that are woven into its fabric combine to compliment and reinforce each other, in order to create a single unifying theme-the equitable treatment of creditors and financial relief for over-burdened debtors. In doing so, the tensions between these seemingly inconsistent objectives have been balanced and harmonized. Consequently, Title 11's various provisions should not be viewed in isolation. Instead, their interpretation should reflect the interplay between all of its different parts, so that the Bankruptcy Code can operate as a coherent whole. The meaning given to any one portion must be consistent with the remaining provisions of the Bankruptcy Code.

*Id.* at 969.

**20.** Because no official report accompanied 11 U.S.C. § 1113, the legislative history contains only the statements read into the Congressional Record. *Unimet*, 842 F.2d at 883 n. 3.

gress intended § 1113(f) to override § 507. *See, e.g., Ionosphere Clubs,* 22 F.3d at 408 (observing that § 1113 fails to address the priority to be accorded claims arising from the breach of a collective bargaining agreement); *Roth,* 975 F.2d at 956 (stating "there is no indication either from the language or the legislative history of section 1113 that Congress intended to address the priority to be given claims based on a collective bargaining agreement"); *Moline Corp.,* 144 B.R. at 79 (concluding that Congress did not intend § 1113(f) to be a super-priority provision).

▉ When Congress intends to change § 507's priority scheme, it does so explicit-

ly. *See Adventure Res.,* 137 F.3d at 797; *Ionosphere Clubs,* 22 F.3d at 408; *Roth,* 975 F.2d at 956. For example, § 507(b) establishes a super-priority claim for loss sustained by a secured creditor attributable to a failure of adequate protection ordered under § 362, § 363 or § 364(d).[21] Section 364(c)(1) permits the bankruptcy court to authorize a trustee or debtor in possession to obtain credit with a priority over "any and all" administrative expenses.[22] Indeed, § 1114(e)(2), which was enacted for the purpose of protecting retiree benefits in bankruptcy, specifically provides for the allowance of retiree benefit claims as administrative expenses.[23] Si-

---

*See Hoffman Bros.,* 173 B.R. at 182 (observing that "[p]assage of § 1113 was not accompanied by a committee report, and there is no dependable legislative history"). Congressional intent, however, should be divined from a rigorous intrinsic examination of the composition and structure of statutory text and its relationship to other parts of the Code, without resorting to legislative history or other extrinsic aids. *See Timbers,* 484 U.S. at 371, 108 S.Ct. 626 (finding that ambiguous terms can be clarified by viewing statutes as a whole); *Rufener Constr.,* 53 F.3d at 1066–67 (opining that the meaning of "plain language" requires a rigorous examination of statutory text). Indeed, Judge Harold Leventhal of the United States Court of Appeals for the District of Columbia Circuit once observed that "using legislative history to find the meaning of a statute is like looking out at an audience and waving to your friends." Abner J. Mikva, *Reading and Writing Statutes,* 28 S. Tex. L.Rev. 181, 185 (1986).

21. Section 507(b) provides:
If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then

such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.
11 U.S.C. § 507(b).

22. Section 364(c) provides:
If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; . . . .
11 U.S.C. § 364(c)(1).

23. Section 1114(e)(2) states:
Any payment for retiree benefits required to be made before a plan confirmed under section 1129 of this title is effective has the status of an allowed administrative expense as provided in section 503 of this title.
11 U.S.C. § 1114(e)(2). "The explicit language and the legislative history of § 1114 stand in stark contrast to the absence of any such language in § 1113. The fact that Congress failed to include similar language in § 1113, which would have created an exemption for immediate payment of any wages of [sic] benefits due under a collective bargaining agreement, is evidence that Congress did not intend § 1113 to be exempt from the operation of other sections of the Code, including the priorities set forth in § 507(a)." *Murray Indus.,* 110 B.R. at 587.

lence should be accorded meaning when the plain language of a statute fails to address a particular situation.[24] The fact that neither § 1113(f) nor § 507 contain language expressly creating a super-priority status for pre-petition collective bargaining agreement wage and benefit claims suggests, by negative inference, an intent by Congress not to do so. *Cf. U.S. v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 1528, 134 L.Ed.2d 748 (1996) (stating that "Congress could have, but did not, deny noncompensatory, postpetition tax penalties the first priority given to other administrative expenses, and bankruptcy courts may not take it upon themselves to make that categorical determination under the guise of equitable subordination").

Unlike *Unimet, Roth* and its progeny reconcile § 507 with § 1113. *Adventure Res.,* 137 F.3d at 797 (stating that § 507 and § 1113 must be construed harmoniously); *Kitty Hawk,* 255 B.R. at 436 (adopting a construction which reconciles § 1113(f) and § 507 in lieu of an interpretation that "causes one section to preempt or ignore another"); *Armstrong Store,* 135 B.R. at 22 (concluding that § 1113(f) and § 507(a) can be harmonized by application of the canons of statutory construction). Courts adopting the *Roth* approach interpret § 1113 as mandating specific conditions under which a collective bargaining agreement must be rejected in chapter 11, and § 507 as governing the payment of any claims arising under such an agreement. *See, e.g., Ionosphere Clubs,* 22 F.3d at 407 (stating that § 507 establishes the priority of claims issuing from a collective bargaining agreement, but does not affect the underlying obligation); *Kitty Hawk,* 255 B.R. at 436 (holding that the terms of a collective bargaining agreement can be respected under § 1113(f) while the financial obligations issuing from it are accorded priority consistent with § 507); *Rayman, Martin,* 170 B.R. at 290 (concluding that § 1113 is not impinged by giving effect to § 507).

Construing § 1113(f) as mandating super-priority status for pre-petition wage and benefit claims under a collective bargaining agreement in chapter 11, but not in chapter 7, leads to anomalous results. As the Third Circuit observed in *Roth,*

"Why, for example, should the very same pre-petition obligations receive an unlimited first priority if the employer debtor files under Chapter 11 but only a third or fourth priority, limited in dollar amount per employee, if the case is filed under Chapter 7? ... If post-petition administrative expenses can be, in effect, wiped out by pre-petition employment related obligations a strong disincentive to reorganization under Chapter 11 would be created."

*Roth,* 975 F.2d at 956, *quoting In re Ohio Corrugating Co.,* 115 B.R. 572, 578 (Bankr. N.D.Ohio 1990), *rev'd,* 1991 WL 213850 (N.D.Ohio 1991).[25] *See Moline Corp.,* 144 B.R. at 80 (stating "[i]t would seem anomalous that if the Union is correct about § 1113(f), claims that would be superpriority claims in a Chapter 11 case are often

---

**24.** *See, e.g., Patterson v. Shumate,* 504 U.S. 753, 758, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (divining Congress' intent in drafting statute by what was not said); *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) (using negative implication to interpret bankruptcy statute); *Johnson v. Home State Bank,* 501 U.S. 78, 87, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (finding significance in lack of legislative specificity in statute).

**25.** The district court reversed the bankruptcy court's decision, finding that *Unimet,* which was not factually distinguishable, was binding precedent in the Sixth Circuit. *United Steelworkers of Am. v. Ohio Corrugating Co.,* 1991 WL 213850, *2 (N.D.Ohio 1991).

nothing more than general unsecured claims in a Chapter 7 case").

Finally, the *Roth* approach fosters the Code's policy to promote equality of distribution. *See Murray Indus.*, 110 B.R. at 587 (stating that "[t]o give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution, it dilutes the value of the priority for those creditors Congress intended to prefer"). The court in *Armstrong Store* concluded that "overriding policy reasons cutting to the essence of bankruptcy philosophy" militate against construing § 1113(f) as modifying the priorities set forth in § 507, stating:

> The bankruptcy filing grants a debtor a breathing spell and generally assures that creditors having similar status will be treated similarly. In the case at hand, we have at least two types of employees—i.e., employees covered by a collective bargaining agreement and employees covered by contract. Were we to accept the moving parties' theory, individuals providing a similar service to these debtors would be treated in dissimilar fashion. One group of unsecured creditors would receive very favorable treatment and probably would be paid one hundred percent (100%) of their claims, whereas the other group of unsecured creditors would likely be paid nothing. Congress obviously did not intend such a result. Had Congress so intended, it would have said so in unequivocal terms.

*Armstrong Store,* 135 B.R. at 22–23.

█ Section 1113 was enacted to protect the existence of collective bargaining agreements in chapter 11 cases, not to reorder the priority scheme set by Congress in § 507. Had Congress intended for § 1113 to create a super-priority for pre-petition wage and benefit claims arising under a collective bargaining agreement, it would have either included language in § 1113 similar to that incorporated into § 1114 or amended § 507 to reflect the change it intended. Because Congress neither included explicit language in § 1113 to supercede § 507 nor amended § 507 to specifically create a super-priority status for such claims, the court concludes that pre-petition claims for wages and benefits due under a collective bargaining agreement are not entitled to treatment as administrative expenses but are to be accorded priority consistent with § 507.

## H. *ARITF's Administrative Expense Claim Under § 1114(e)(2)*

█ In its amended proof of claim, ARITF states that $45,574.52 of its claim for unpaid pre-petition benefit payments represents CAT's delinquent contributions to the Health Fund, a multi-employer pooled account used to provide medical benefits to employees and retirees. Having ruled that its claim is not entitled to a super-priority status under § 1113(f), ARITF argues, in the alternative, that the $45,574.52 due to the Health Fund should be allowed as an administrative expense under § 1114(e)(2) because "an unsegregated and undivided portion of CAT's delinquent contributions constitute retiree benefits" within the meaning of § 1114(a).[26] CAT objects to ARITF's § 1114(e)(2) claim, arguing that ARITF's pooled Health Fund account is not a "plan, fund or program" established by the debtor as required by § 1114(a). CAT further argues that the delinquent pre-petition contributions could not possibly be "retiree benefits" within the meaning of § 1114(a)

26. *Response to Debtor's Objections to the Proofs of Claims for the Airconditioning and Refrigeration Industry Trust Funds, Sheet Met-* *al Workers Trust Funds, and Plumbers and Pipefitters National Pension Plan and International Training Fund,* p. 8, l.4–6.

because CAT does not have any retired employees receiving benefits from the Health Fund.

On June 16, 1988, Congress enacted the "Retiree Benefits Bankruptcy Protection Act of 1988"[27] adding § 1114 to protect the interests of retirees of chapter 11 debtors. *See generally*, 7 Collier on Bankruptcy ¶ 1114.01[1], at 1114–10 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2003). Section 1114 was Congress' response to the termination of health and life insurance benefits of approximately 78,000 retirees in the *LTV Corporation* chapter 11 case.[28] Section 1114 requires a trustee or debtor-in-possession to continue to pay retiree benefits under a "plan, fund or program" at the levels maintained prior to commencement of the case absent a modification agreed to by the parties or ordered by the court. 11 U.S.C. § 1114(e)(1). Prior to seeking modification by the court, a trustee or debtor-in-possession must attempt to negotiate the terms of a mutually-acceptable modification with the "authorized representative" of the retiree benefit recipients.[29] *See* 11 U.S.C. § 1114(c)–(d). A court-approved modification may be sought only after negotiations have been exhausted, the retiree's authorized representative has refused to accept the proposed modification without good cause, and the modification is necessary to reorganization. *See* 11 U.S.C. § 1114(f)–(g).

Section 1114(e)(2) specifically provides that a payment for retiree benefits required to be made before a plan confirmed under § 1129 is effective has the status of an allowed administrative expense.[30] 11 U.S.C. § 1114(e)(2). "Retiree benefits," for purposes of § 1114, include:

> [P]ayments to any entity or person for the purpose of providing or reimbursing payments *for retired employees* and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under *any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor* prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a) (emphasis added). Because § 1114(a) refers to plans established or maintained "by the debtor," CAT asserts that the term "retiree benefits" in § 1114(a) should be narrowly construed and limited to a "debtor's payments to its retired employees."[31] According to CAT, an employer's contributions to a union's multi-employer pooled health plan which provides medical benefits to retired employees is outside the scope of § 1114(a).

Congress did not define the phrase "any plan, fund or program" in § 1114. However, the term is used in § 1002(1) of ERISA, which defines an "employee welfare benefit plan," as follows:

> The terms "employee welfare benefit plan" and "welfare plan" mean *any plan, fund or program* which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such *plan, fund or program* was estab-

---

27. Pub.L. No. 100–334, 102 Stat. 610 (1988).

28. S.Rep. No. 100–119, at 2 (1987), *reprinted in* 1988 U.S.C.C.A.N. 683, 683.

29. Generally, the labor organization is the "authorized representative" in cases involving

a collective bargaining agreement. 11 U.S.C. § 1114(c)(1).

30. *See supra* note 23.

31. *Reply to Trust Funds' Response to Debtor's Objection to Claims*, p. 2, l.1.

lished or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or pre-paid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1) (emphasis added). *See In re N.Y. Trap Rock*, 126 B.R. 19, 22 (Bankr.S.D.N.Y.1991) (using ERISA's definition of "plan, fund or program" to construe § 1114(a)). Neither CAT nor ARITF dispute the fact that ARITF's Health Fund is an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1).

Section 1114(a)'s relevant phrase is "maintained or established in whole or in part by the debtor." CAT's interpretation of § 1114(a) centers on the phrase "by the debtor" and fails to take adequate account of the statute's focus on the terms "maintained . . . in whole or in part." Secondly, "retiree benefits" is defined broadly in § 1114 to include direct payments to retirees, as well as indirect payments to any

person or entity for the purpose of providing or reimbursing payments for medical, surgical, hospital care and other benefits. 11 U.S.C. § 1114(a). Section 1114(a) covers not only debtors which are self-insurers, but also those which have third party insurance plans or contribute to multi-employer plans. 7 *Collier on Bankruptcy* ¶ 1114.02[2][c], at 1114–15 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2003). Reading the various components of § 1114 together, the court concludes that contributions to multi-employer health plans, such as ARITF's Health Fund, mandated by a collective bargaining agreement are "retiree benefits" within the meaning of § 1114(a).[32]

It is undisputed that CAT is a party to the collective bargaining agreement under which ARITF's Health Fund is maintained, and that CAT is required to make monthly contributions to ARITF on behalf of its employees for the Health Fund. CAT does not dispute that the Health Fund covers retired employees nor that it provides medical benefits to retired employees. The fact that CAT may not currently have retired employees receiving benefits from the Health Fund does not change the fact that its contributions to the Health Fund are covered by § 1114(a). ARITF's Health Fund is financed by employer contributions, and a loss of such contributions

---

**32.** This broad construction of § 1114(a)'s text is consistent with the legislative history of the statute. Senate Report No. 100–119 states:

> The Committee recognizes that *some debtors may provide retiree benefits by contributing in accordance with a collective bargaining agreement to multiemployer health, welfare, and pension plans.* These plans are trust funds established and maintained by more than one employer pursuant to one or more collective bargaining agreements. Pursuant to Federal employee benefits and labor laws, these plans are separate legal entities and are administered by labor-management boards of trustees for the exclusive

benefit of the plan participants and beneficiaries. They are generally financed solely by employer contributions, and a loss of such contributions from any one employer detracts from a plan's ability to pay benefits to the participants and beneficiaries of the plan as a whole.

> *Retiree benefits include contributions or other required payments to multiemployer plans for the purposes described in the bill. Therefore, the requirements of S. 548 apply to these benefits arrangements.*

S.Rep. No. 100–119, at 4 (1987), *reprinted in* 1988 U.S.C.C.A.N. 683, 685–86 (emphasis added).

from any one employer detracts from a plan's ability to pay benefits to participants and beneficiaries of the plan as a whole.

For the foregoing reasons, the court finds that ARITF's Health Fund is a "plan, fund or program" funded and maintained, in part, by CAT for purposes of § 1114(a) and that CAT's delinquent contributions to the fund totaling $45,574.52 are entitled to allowance as an administrative expense under § 1114(e)(2). Therefore, CAT's objection to ARITF's amended proof of claim on such ground is overruled.

### III. CONCLUSION

In summary, CAT's objections to the Trust Funds' proofs of claim, as amended, predicated upon the application of § 1113(f) are sustained, and CAT's objection to ARITF's claim pursuant to § 1114(e)(2) is overruled.

SMTF's claim for unpaid employee benefit contributions of $2,492.53, which accrued within 180 days before the filing of the petition, is allowed as an unsecured priority claim under § 507(a)(4), and its claim for liquidated damages and attorneys fees totaling $9,405.62 is allowed as a general unsecured claim. PTTF's claim for delinquent benefit contributions of $17,093.41, which accrued within 180 days before the filing of the petition, is allowed as an unsecured priority claim pursuant to § 507(a)(4), and its claim for liquidated damages and attorneys fees totaling $6,856.88 is allowed as a general unsecured claim.

ARITF's claim for $45,574.52 in delinquent pre-petition contributions to the Health Fund is allowed as an administrative expense pursuant to § 1114(e)(2). ARITF's claim for $10,589.87 representing delinquent contributions to the "Vacation Account," which accrued within 90 days prior to bankruptcy, is allowed under § 507(a)(3), and the remaining plan contributions of $79,015.11 accruing within 180 days before the filing of CAT's petition is allowed under § 507(a)(4). Finally, ARITF's claim for liquidated damages and attorneys fees totaling $21,359.17 is allowed as a general unsecured claim.

The court will enter a separate order consistent with this opinion.