**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 1, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

M. STEPHEN PETERS,

      Plaintiff - Appellant,

v.

PIKES PEAK MUSICIANS
ASSOCIATION,

      Defendant - Appellee.

------------------------

COLORADO SPRINGS SYMPHONY
ORCHESTRA ASSOCIATION

      Debtor.

No. 05-1017

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 04-M-765, Bankruptcy Case No. 03-10421 HRT)**

---

Philip A. Pearlman, Pearlman & Dalton, P.C., Denver, Colorado, for Appellant.

Brent R. Cohen (S. Kato Crews with him on the brief), Rothgerber Johnson &
Lyons LLP, Denver, Colorado, for Appellee.

---

Before **HENRY**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

This appeal arises from a bankruptcy case in which the Colorado Springs Symphony Orchestra contested the payment of its musicians' wages and benefits as administrative expenses from the bankrupt Orchestra's estate. At the time the Orchestra filed for Chapter 11 reorganization, the parties were subject to a collective bargaining agreement requiring the musicians to remain available for rehearsals and performances on a flexible basis. In exchange, the agreement guaranteed them compensation for a minimum number of pay periods, regardless of whether their services were used by the Orchestra during that time.

After the Orchestra filed its bankruptcy petition, it continued to plan for concerts because it was actively seeking to reorganize its business. Accordingly, although the concert schedule was uncertain during the post-petition period, the musicians remained available to perform if called upon to do so. Ultimately, however, the Orchestra was unable to resolve its financial difficulties. It cancelled all previously scheduled concerts, obtained court-approved rejection of its collective bargaining agreement, and, finally, commenced liquidation proceedings.

The Pikes Peak Musicians Association, which represents the musicians, sought and obtained payment of their post-petition wages and benefits as

administrative expenses, which receive first priority under the Bankruptcy Code.[1]
*See* 11 U.S.C. §§ 503(b)(1)(A), 507(a)(1).

Having jurisdiction pursuant to 28 U.S.C. § 158(d), we AFFIRM.

## I. Background

The Colorado Springs Symphony Orchestra was a private, community-based organization that employed local talent who performed pursuant to a collective bargaining agreement. The Pikes Peak Musicians Association acted as the musicians' exclusive agent in contract negotiations. During the 2002–2003 season, the Orchestra encountered financial difficulties, and, on January 10, 2003, it filed a petition for voluntary Chapter 11 reorganization. At that time, the collective bargaining agreement between the parties was set to run through August 31, 2003. The agreement was akin to a minimum quantity contract in that the musicians were guaranteed compensation for a certain number of pay periods, regardless of whether the Orchestra held any rehearsals or performances during those periods. This allowed the Orchestra to schedule events with the assurance that, even on relatively short notice, its musicians would be available to perform.

On February 13, 2003, a little over one month after filing its Chapter 11 petition, the Orchestra obtained court approval to reject its collective bargaining

---

[1] Although the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended § 507, shifting administrative expenses to second priority, the amendment does not affect cases such as this one that were filed prior to April 20, 2005. Pub. L. No. 109-8, § 1406, 119 Stat. 23, 215 (2005).

agreement with the musicians. During the interim month, the Orchestra had been seeking to save itself financially, and the status of rehearsals and performances had remained fluid and uncertain. Although the musicians remained ready, willing, and able to perform during that period, the Orchestra eventually cancelled all previously scheduled concerts, and the musicians were never called upon to play. Ultimately, the Orchestra, having been unsuccessful in its attempts to reorganize its financial affairs, converted its Chapter 11 reorganization to a Chapter 7 liquidation proceeding and appointed M. Stephen Peters as trustee.

The Association filed claims for payment of the musicians' wages and benefits due under the collective bargaining agreement for the period between the January 10 petition date and the February 13 rejection date. Styling its request as an application for allowance and payment of administrative expenses pursuant to 11 U.S.C. § 503(b)(1)(A), the Association sought first priority of payment under 11 U.S.C. § 507(a)(1).

The bankruptcy court issued a thorough written order granting the application and directing the trustee to pay the Orchestra's post-petition obligations as Chapter 11 administrative expenses.

## II. Discussion

The trustee contends the musicians' claims fail to meet the requirements for administrative expense priority under 11 U.S.C. § 503 and § 507. In particular, the trustee argues that the musicians' failure to rehearse or perform after the filing

-4-

of the petition disqualifies their wages from consideration as expenses necessary to preserve the Orchestra's business during reorganization.

The Association argues that the musicians' wage claims are given payment primacy by Congress under another provision of the Bankruptcy Code, § 1113, which grants special protections to union members in the collective bargaining agreement context. The Association claims it is entitled to first priority, even if its wage claims fail to qualify as administrative expenses.

Our cases construing § 503 and § 507 have not yet considered whether and how their application is affected by the labor protections contained in § 1113. Accordingly, we address that question here.

## A. Statutory Framework

### 1. Sections 503 and 507

Section 503 establishes that costs incurred in the preservation of a bankrupt business, such as rent or compensation for ongoing operations, are payable as administrative expenses. It provides,

> After notice and a hearing, there shall be allowed as administrative expenses . . . the actual necessary costs and expenses of preserving the estate including . . . wages, salaries, and commissions for services rendered after the commencement of the case . . . .

11 U.S.C. § 503(b)(1)(A).

Section 507, in turn, assigns priority of payment to different types of claims against a bankrupt estate and provides,

The following expenses and claims shall have priority in the following order . . . . First, administrative expenses allowed under § 503(b) of this title . . . .

11 U.S.C. § 507(a)(1).

In applying these provisions to past cases, we have granted administrative expense priority to claims that satisfy two elements: (1) the claim resulted from a post-petition transaction, and (2) the claimant supplied consideration that was beneficial to the debtor-in-possession (or trustee) in the operation of the company's business. *In re Amarex, Inc.*, 853 F.2d 1526, 1530 (10th Cir. 1988) (relying on the analysis in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir. 1976)). These elements derived from the text of § 503(b)(1)(A), which allows a claim to be treated as an administrative expense if the claim is (1) for "wages, salaries, and commissions for services rendered after the commencement of the case," (2) which represent "the actual, necessary costs and expenses of preserving the estate."

Our subsequent cases have applied this analysis in a number of factual circumstances. *See, e.g.*, *In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291, 1293–96 (10th Cir. 2001) (rejecting administrative expense priority to employee claims for lump-sum payments because the employees could not show that the claim resulted from a post-petition transaction with the debtor-in-possession, or that the lump sum represented consideration for a benefit provided to the estate); *In re Bayly Corp.*, 163 F.3d 1205, 1208–1211 (10th Cir. 1998) (denying

administrative expense status for employee benefit claims that matured due to post-petition plan termination because such benefits were consideration for labor provided pre-petition); *In re Mid-Region Petroleum*, 1 F.3d 1130, 1132–34 (10th Cir. 1993) (disallowing administrative expense priority to claims for payment on leased railroad cars because post-petition possession was not sufficient to constitute a benefit to the debtor-in-possession in the operation of its business).

These cases, however, did not present facts implicating § 1113, which was enacted after our decision in *Amarex*.

## 2. Section 1113

Section 1113 was added to the Bankruptcy Code in 1984[2] in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984). In *Bildisco*, the Court held that a debtor could avoid the legal obligation "to comply with the terms of a collective bargaining agreement subsequent to the [petition] filing date but prior to a determination regarding formal rejection of the agreement by the bankruptcy court." *Collier on Bankruptcy*, ¶ 1113.03[1] (15th ed. 1990) (providing summary and analysis of *Bildisco* holding). In the context of Chapter 11 reorganization, the effect of this decision was to provide incentives for companies to threaten bankruptcy as leverage in labor contract negotiations. *See In re Certified Air Techs., Inc.*, 300 B.R. 355, 361 (Bankr. C.D. Cal. 2003).

---

[2] The provision was part of the Bankruptcy Amendments of 1984, Pub L. No. 98-353, 98 Stat. 333 (1984).

Congress enacted § 1113 to remove this incentive by prohibiting the debtor-in-possession or trustee from making unilateral changes to the terms or conditions of a collective bargaining agreement during reorganization. *See In re FBI Distrib. Corp.*, 330 F.3d 36, 44 (1st Cir. 2003). Instead, § 1113 required them to obtain court approval before taking any action on a prior agreement. Specifically, the amended section declares,

> No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provision of a collective bargaining agreement prior to compliance with the provisions of this section [i.e., requirements for court approval].

11 U.S.C. § 1113(f).

### 3. Reconciling the Provisions

Since the enactment of § 1113, courts have struggled to determine whether this provision lessens the burden for achieving administrative expense priority under § 503 and § 507 when claims arise out of collective bargaining agreements. The circuits have split on the issue.

The minority approach is represented by the Sixth Circuit in *In re Unimet Corp.*, 842 F.2d 879 (6th Cir. 1988). In that case, the United Steelworkers of America sought payment of insurance premiums under a collective bargaining agreement for their members, who were retirees of the bankrupt Unimet Corporation. The court held that the remedial purpose of § 1113 trumped the literal language of § 503, thus entitling parties to administrative expense priority

under § 507 for claims filed pursuant to collective bargaining agreements, even where the requirements of § 503 had not been satisfied.

A number of district courts following *Unimet* have concluded that virtually any claim under a collective bargaining agreement is entitled to a "superpriority" or automatic priority status because of § 1113. *See, e.g.*, *In re Arlene's Sportswear, Inc.*, 140 B.R. 25 (Bankr. D. Mass. 1992); *In re St. Louis Globe-Democrat, Inc.*, 86 B.R. 606, 609-10 (Bankr. E.D. Mo. 1988). The rationale is that such an interpretation is necessary to give teeth to the protections against unilateral employer action created by § 1113. If an employer remains technically bound to a collective bargaining agreement during the post-petition period but employees are unable to recover for claims under the agreement, the added protections of this provision are illusory. *See Unimet*, 842 F.2d at 885–86.

The majority of courts, however, have taken a contrary approach, first articulated by the Third Circuit in *In re Roth American, Inc.*, 975 F.2d 949 (3d Cir. 1992). There, the bankrupt company had a collective bargaining agreement with its employees, who were represented by the local Teamsters union. After the company filed for Chapter 11 reorganization and ultimately ceased operations, the union sought vacation and severance pay earned both before and after filing for bankruptcy. Applying the literal language of § 503(b)(1)(A), the court held that services have to be "rendered after the commencement of the case" in order to qualify for payment as administrative expense claims. In that case then, the

benefits that accrued based on services performed after the filing of the petition were given priority as § 503 administrative expenses, but the benefits that accrued beforehand were not.

The court declined the opportunity to alter its analysis based on § 1113 because "no language in section 1113 addresse[d] the priority to be accorded [such] claims." *Id.* at 956. To bolster its interpretation of the text, the *Roth* court contrasted § 1113 with the immediately succeeding provision, § 1114. Whereas § 1113 creates protections for collective bargaining agreement claims, § 1114 creates protections for retiree benefit claims. Notably, however, where § 1113 is silent about the priority to be accorded such claims, § 1114 specifically provides that "[a]ny payment for retiree benefits . . . has the status of an allowed administrative expense as provided in section 503 of this title." 11 U.S.C. § 1114(e)(2). Thus, the court concluded, if Congress had wished to create an automatic priority for collective bargaining agreement claims, it would have been similarly explicit in § 1113. Conversely, its failure to do so should counsel against a court's attempts to read such requirements into the statute. *See Roth*, 975 F.2d at 956.

The Second and Fourth Circuits have followed the *Roth* approach. The Second Circuit read § 507 and § 1113 to avoid conflict with one another by reasoning that "[j]udicial ordering of benefit claims pursuant to § 507 is not equivalent to employer avoidance of obligations under a collective bargaining

agreement." *See In re Inosphere Clubs, Inc.*, 22 F.3d 403, 407 (2d Cir. 1994) (holding pre-petition claims, even under a collective bargaining agreement, are not administrative expenses under § 507(a)(1)). Thus, the court concluded that, by denying administrative expense priority for vacation pay accrued pre-petition on the grounds that it failed to meet the requirements of § 503 and § 507, it was not allowing the kind of unilateral employer action prohibited by § 1113.

Along the same lines, the Fourth Circuit allowed claims under a labor contract to be payable as administrative expense claims but only because it determined the traditional elements of § 503(b)(1)(A) were met. The court reasoned,

> [T]he language employed by Congress in § 1113 is unequivocal, insofar as it goes. It plainly imposes a legal duty on the debtor to honor the terms of a collective bargaining agreement, at least until the agreement is properly rejected . . . . Section 1113, however, offers no advice as to how this new category of claims should be treated *vis a vis* other categories competing for payment.

*Adventure Res., Inc. v. Holland*, 137 F.3d 786, 796 (4th Cir. 1998). Moreover, the court emphasized, "It is imperative to the orderly administration of the bankruptcy process that § 507 remains, unless otherwise clearly specified by Congress, the final word on the priorities of competing claims." *Id.* at 797. Therefore, it concluded, "a bankruptcy claim arising from the breach of a collective bargaining agreement may be accorded priority status *only* insofar as it

fits into one of the categories singled out for preferential treatment in § 507." *Id.* (emphasis added).

In sum, the majority of cases continue to limit the administrative expense priority provided in § 507 to claims that meet the textual requirements of § 503, even in cases that arise under collective bargaining agreements that implicate § 1113.

## B. Application

In this case, the Association urges us to adopt the minority position articulated in *Unimet*, whereas the trustee argues we should follow the majority approach explained in *Roth*, *Ionosphere*, and *Adventure Resources*. The Association asserts that § 1113 "offers extraordinary protection to employees that are the subject of collective bargaining agreements," Aplt. Br. at 6, and urges us to adopt a "superpriority" for claims implicating § 1113, even where the ordinary requirements of § 503 have not been met. Conversely, the trustee asks this court to strictly apply the elements of § 503, as embodied in the *Amarex* test, in all contexts, including those arising under collective bargaining agreements. Since the musicians neither rehearsed nor performed after the Orchestra filed its bankruptcy petition, the trustee argues, their claims fail to meet either prong of the traditional two-part test. The musicians' mere availability, he contends, does not qualify as a post-petition service. Nor was it beneficial to the Orchestra who never called upon the musicians to play.

In our view, § 1113 does not trump the priority scheme set forth in § 503 and § 507.  Thus, we reject the minority position on this issue.  Section 1113's enactment does, however, require us to reconsider the applicability of *Amarex*'s two elements in the context of collective bargaining agreements.  Accordingly, we address each of its requirements in turn.

**1.**

The first element of the *Amarex* test requires that the claim arise from a "transaction" that occurred after the filing of a bankruptcy petition.  This derives from the portion of § 503(b)(1)(A) that requires "services rendered after the commencement of the case."  We have previously construed this element to require affirmative action from the debtor-in-possession to either (1) accept the prior agreement between the debtor and claimant, or (2) agree to a new contract.  For example, we previously held, "It is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration."[3]  *Commercial Fin. Servs.*, 246 F.3d at 1294 (quoting *Mammoth Mart*, 536 F.2d at 955).

---

[3]  A debtor-in-possession is a "[d]ebtor who, during the pendency of the case prior to confirmation of the reorganization plan, retains the bankruptcy estate's property in the fiduciary capacity of a trustee."  Black's Law Dict. 280 (1991).

This interpretation, however, must yield to the effect of § 1113 in the collective bargaining context. Section 1113 prohibits the debtor-in-possession from unilaterally taking action to alter a collective bargaining agreement. This includes replacing the pre-existing agreement with a new post-petition agreement. Thus, § 503(b)(1)(A) cannot be read to *require* the debtor-in-possession to take new action in this context when that is expressly *prohibited* by § 1113. Moreover, § 1113 mandates that, in any event, the agreement continues to bind both parties unless and until its rejection is approved by the bankruptcy court. Thus, it would similarly create a conflict if we interpreted § 503(b)(1)(A) to allow alterations to collective bargaining agreements in situations where court approval was not obtained. To this extent, § 1113 modifies the transaction requirement established by *Amarex* in the collective bargaining agreement context.[4]

This does not mean, however, that the mere existence of an unrejected collective bargaining agreement is sufficient to accord priority status to any post-petition claims. As noted above, the text of § 503(b)(1)(A) requires that claims rest upon "services rendered after the commencement of the case." Thus, the

_____

[4] Because we resolve the broader issue of the implications of § 1113 claims on the priority scheme of § 503 and § 507, we need not consider whether the Orchestra here induced the musicians to remain available to perform by maintaining rehearsal and concert schedules, thereby implicitly affirming the collective bargaining agreement under *Commercial Fin. Servs., Inc.,* 246 F.3d at 1295.

focus is not on the post-petition actions of the *debtor-in-possession* but on the post-petition services performed by the *claimant*.

In this case, although the trustee argues the musicians did not participate in any rehearsals or productions during the post-petition period, he admits they remained ready, willing, and able to do so. In order to determine whether this qualifies as "services rendered" under § 503(b)(1)(A), we must ask whether the musicians' continuing availability means they performed under the contract's terms.

In these circumstances, we answer this question affirmatively. It will typically be a simple matter to determine whether employees have performed services under a collective bargaining agreement. Here, the service specifically bargained for was *availability*. The parties explicitly agreed that, as long as the musicians remained available, they would be compensated for a minimum number of pay periods, regardless of whether the Orchestra called upon them to play. Thus, it was possible for the musicians to comply with the agreement (and be entitled to full compensation) even if they never played. This interpretation is confirmed by the facts of this case. Even after the filing of the petition, the Orchestra scheduled practices and events but subsequently cancelled them. Accordingly, we conclude that, by foregoing other opportunities and remaining ready, willing, and able to play, the musicians performed "services" under the terms of the contract.

Because the musicians' availability constitutes post-petition services under the collective bargaining agreement, the first element of an administrative expense priority claim is met.

**2.**

The second element of the *Amarex* test requires that the claimant provide consideration that was "beneficial to the debtor-in-possession in the operation of [its] business." *Amarex*, 853 F.2d at 1530. This derives from the portion of § 503(b)(1)(A) that requires the services rendered to be "actual, necessary costs and expenses of preserving the estate."

Here, the Orchestra initially bargained with the musicians for their availability to rehearse and perform. The bankruptcy court concluded that, in light of § 1113, it need not independently determine whether this constituted a benefit to the bankrupt Orchestra for purposes of *Amarex*. It instead needed only to examine the provisions of the collective bargaining agreement to determine whether the parties considered the services beneficial. We disagree. The text of § 503(b)(1)(A) requires the services to be *necessary* to the preservation of the estate following a Chapter 11 filing. The agreement here contains no provision expressing the parties' consensus on this issue under the facts of this case.

For the following reasons, we conclude that availability was necessary to the preservation of the Orchestra's estate. First, after filing its petition, the Orchestra took steps to survive its financial difficulties, which included alternately scheduling and cancelling rehearsals and performances in an attempt to execute a workable business strategy. The musicians performed their end of the bargain, foregoing the opportunity to seek employment elsewhere.

Second, it is clear that during this unsettled period, the availability of the musicians was essential to the success of the attempted reorganization. In fact, the mass exodus of the Orchestra's most important assets would have hastened the organization's collapse. Consider a similar attempted reorganization of an entertainment company like the Harlem Globetrotters or the Ice Capades. Nothing could save current operations if the unique talent in those organizations fled upon the filing of a Chapter 11 petition. Musicians possess unique talents and an orchestra has a special chemistry, especially where, as here, the group of musicians has been practicing and performing together over the course of a season. The loss of their services would be insurmountable if some or all of the musicians ceased to remain available to play.[5]

---

[5] The Orchestra argues a different outcome is required by our decision in *In re Mid-Region Petroleum, Inc.*, 1 F.3d 1130 (10th Cir. 1993), a case applying § 503 outside the collective bargaining agreement context. In that case, Mid-Region Petroleum filed for bankruptcy and retained possession of leased railroad cars that had been provided pre-petition by General American Transportation Corporation. Mid-Region had already ceased its business operations and

(continued...)

Accordingly, because the musicians' availability was not only beneficial but necessary to the preservation of the Orchestra's business, the second element required to achieve administrative expense priority is also met.

\* \* \*

In sum, the enactment of § 1113 requires revision of our previous *Amarex* test in the collective bargaining agreement context. Where a claim is made pursuant to a collective bargaining agreement, it will qualify for administrative expense priority where (1) the claimant renders post-petition services, (2) which are necessary to preserving the bankrupt estate. Not only does this recognize the literal language of § 503(b)(1)(A), but it avoids conflict with § 1113 because it does not permit the debtor to unilaterally alter the terms of a collective bargaining agreement.

---

[5](...continued)
therefore never made use of the railroad cars during the post-petition period. When General American sought to have their lease payments classified as administrative expenses, we denied the request, holding General American provided no post-petition consideration that was beneficial to the debtor-in-possession in the operation of its business.

Here, by contrast, the musicians did provide a post-petition benefit to the Orchestra. As noted above, the Orchestra was actively seeking to preserve its business and initially continued to anticipate concerts at which the musicians were bound to play. Had the musicians refused to comply with the terms of the agreement and failed to remain available, the Orchestra could not have even attempted its plan to continue the operation of its business. Thus, in addition to the § 1113 implications, this case is readily distinguishable from *Mid-Region Petroleum* on its facts.

In this case, because the musicians performed under the agreement during the post-petition period, and because their availability was necessary to the continuation of the Orchestra's business, we find they have met both elements necessary to establish priority under § 507.

## C. Value of Services and Applicable Pay Period

In the event we affirm the district court, the Orchestra asks us to remand for further proceedings on two issues: (1) the value of the services provided by the musicians, and (2) the applicable pay period for which the musicians provided services to the Orchestra.

The first issue was not raised below and has therefore been waived. *See Cummings v. Norton*, 393 F.3d 1186, 1190–91 (10th Cir. 2005). In any event, remand is unnecessary since the value of the services is easily computed from the terms of the agreement.

The trustee claims secondarily that, if this court concludes the musicians' claims are payable as administrative expenses, we should reconsider the applicable time period. The bankruptcy court approved rejection of the collective bargaining agreement on February 13, 2003, and allowed the musicians to receive priority of payment for their claims through that date. The trustee urges us to deem the agreement rejected at the time the Orchestra *requested* rejection, January 21.

This argument conflicts with the plain language of § 1113(f), which explicitly prohibits unilateral termination of an agreement prior to court approval. The trustee reasons that the musicians unnecessarily delayed the court's determination by filing an opposition to the Orchestra's motion that it subsequently withdrew. The trustee's equity-based argument not only contradicts the text of the statute but is defeated on its own terms. Section 1113(e) provides a specific process to obtain interim relief if the collective bargaining agreement burdens the estate:

> If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and hearing, may authorize the trustee to implement interim changes to the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

11 U.S.C. § 1113(e). The Orchestra did not seek relief under this provision. Fault for the delay cannot lie solely with the musicians where the Orchestra had an alternative means of expediting the process at its disposal, yet failed to do so.

### III. Conclusion

For the reasons stated above, we AFFIRM.

-20-